[Civ. No. 17993. Third Dist. Feb. 6, 1979.]

COUNTY OF SACRAMENTO, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
GEORGE S. KUHN et al., Real Parties in Interest.

**COUNSEL**

Memering, DeMers & Ford, Claudia J. Robinson and Henry W. Crowle for Petitioner.

No appearance for Respondent.

Hoberg, Finger, Brown, Carlson, Cox & Molligan, Richard H. Carlson, David Moyer and Vicki L. Hobel, for Real Parties in Interest.

**OPINION**

**PARAS, J.**—The County of Sacramento (County) has filed this petition for writ of mandate to compel the respondent superior court to grant its motion for summary judgment (and to vacate its order denying such motion) in the underlying action for wrongful death of Michael Kuhn. Michael died by drowning in the American River on June 15, 1974, and his parents filed the action against the County, the City of Sacramento, and the State of California (State).

The real parties in interest filed no counterdeclarations in connection with the summary judgment motion; they opposed it successfully by references to depositions and by asserting the insufficiency of the moving papers to eliminate all triable issues of fact. Our review of the facts and the law leaves us in disagreement with the trial court, and we shall decree accordingly.

## I

We here set forth the facts as established both in support of and in opposition to the motion.

Michael was "floating" down the American River, a natural tributary of the Sacramento River, in a manner typical of that very popular recreational activity during the summer months. A large "snag," consisting of uprooted trees washed away from some unknown part of the upstream shore by erosive action of the flowing water, had become lodged in the approximate center of the flow; the trees were held together by a "clump of dirt and mud and roots;" the snag created rapids through the area.[1] Michael's floating device somehow became impaled upon the snag; he was dislodged and trapped underwater by the snag and current.

The County owned 40 acres of real property known as Paradise Beach, a public park, adjacent to the site of the tragedy. This acreage did not at any point reach the actual waterway. The remaining adjoining land was owned by the State, as was the land over which the water flowed (Civ. Code, § 670; *People* ex rel. *Baker* v. *Mack* (1971) 19 Cal.App.3d 1040, 1050 [97 Cal.Rptr. 448]). The flow of water in this area of the river varies in accordance with controls operated upstream at the Folsom and Nimbus Dam site by the Federal Bureau of Reclamation. Rangers of the Sacramento County Parks and Recreation Department routinely patrolled the Paradise Beach area, their primary duties consisting of litter control and control of the conduct and activities of persons on the County property. They were neither directed nor expected to inspect the river itself to determine its safety for recreational purposes. However when in the course of their duties they observed any dangerous condition on or about the river, they normally reported it to their superiors.

On June 13, 1974, two days before the drowning, Ranger James Terry observed the snag in question and reported it to his employer. On June 25, 1974, after the drowning, Don H. Nance, Director of the Parks and Recreation Department, determined to remove the snag. He contacted the Corps of Engineers for this purpose, and on June 28th the snag was removed by the joint effort of the corps and the County.

---

[1] This condition is not at all uncommon in the American River.

II

In support of its summary judgment motion (and again on appeal), the County urged two defenses; first, immunity under Government Code section 831.2;[2] second, a lack of ownership or control over the site of the drowning (§ 830, subd. (c)). We have concluded that the claimed immunity exists as a matter of law. We need not address the second issue.

Section 831.2 provides: "Neither a public entity nor a public employee is liable for an injury caused by a natural condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river, or beach."

The County is a public entity within the meaning of section 831.2 (§ 811.2). The American River is a stream or river, and both as to its bed and its flow, is "unimproved public property," within the meaning of section 831.2. It remains only to consider whether the death (injury—§ 810.8) was "caused by a natural condition" of such property. It was. The "condition" which caused the death was a combination of the flow of water and the snag. The latter, by the undisputed evidence, consisted of trees washed out of the upstream shoreline by the waterflow; it became lodged downstream by the streambed's own obstructions. These were all conditions of nature. There was nothing manmade or artificial about the snag or the river or the flow of water. These all were conditions of nature, and hence constituted collectively a "natural condition" within the meaning of section 831.2.

Real parties in interest argue that because at the dam site some 15 miles upstream, the flow of water may be and is increased or decreased by man, conditions on and in the American River, including the condition in question here, are not natural. This contention is not tenable. Even if we were persuaded to hold that the flow control somehow has converted the entire downstream American River into an artificial or manmade stream, section 831.2 still provides for immunity as to a natural condition of such a stream (*Osgood* v. *County of Shasta* (1975) 50 Cal.App.3d 586 [123 Cal.Rptr. 442]), and it cannot be denied that the snag and the current constituted such a natural condition. More to the point however, the American River existed as a tributary of the

---

[2]Section references henceforth are to the Government Code.

Sacramento River long before the dams were built. For ages its waters flowed on the very same bed upon which the snag established itself, heavy in times of cloudburst, light in times of drought, essentially the same way they flow today. This flow, and conditions incidental to it, are no less natural since the advent of human regulation than before; and to say otherwise would be to impose a synthetic meaning upon the uncomplicated and straightforward language of section 831.2.

Indeed if Folsom Dam were to make the downstream American River unnatural for purposes of section 831.2, so would it make the Sacramento River as well, into which the American flows and whose flow it thereby necessarily affects. Thus from its confluence with the American River down to the San Francisco Bay, the immunity of section 831.2 would not apply to the Sacramento. Even more absurdly, under such a hypothesis the Sacramento River for over 300 miles south of the Shasta Dam would no longer be a natural river, nor would it contain any natural conditions within the meaning of section 831.2, because of the flow controls at Shasta Dam. Under any rational approach, the snag was a natural condition within the meaning of section 831.2, hence the County was immune from liability for injury or death caused by it.

*Buchanan* v. *Los Angeles County Flood Control Dist.* (1976) 56 Cal.App.3d 757 [128 Cal.Rptr. 770], offers no inconsistency; a cursory look at its facts readily discloses the artificiality of the agency which there brought about the death. In contrast, any claim here that the regulation of the waterflow brought about the snag is stark speculation, and antithetical to the only credible evidence on the subject. (Cf. *Fuller* v. *State of California* (1975) 51 Cal.App.3d 926, 936-938 [125 Cal.Rptr. 586].)

The meaning of section 831.2 should not be tortured to the extent necessary for real parties in interest to prevail. Such an effort is unwarranted in any event, but additionally is proscribed by the public policy behind the immunity. Such policy is clearly expressed by the Senate Legislative Committee comment accompanying section 831.2, and places the statute in unmistakable perspective. It states in pertinent part: "It is desirable to permit the members of the public to use public property in its natural condition . . . . But the burden and expense of putting such property in a safe condition and the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the

acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property in its natural condition to assume the risk of injuries arising therefrom as a part of the price to be paid for benefits received."

Let a writ of mandate issue commanding the trial court to grant summary judgment to the County and to vacate its order of denial.

Regan, Acting P. J., and Evans, J., concurred.

A petition for a rehearing was denied March 2, 1979, and the petition of the real parties in interest for a hearing by the Supreme Court was denied April 12, 1979. Bird, C. J., Mosk, J., and Newman, J., were of the opinion that the petition should be granted.