[No. H007558. Sixth Dist. Mar. 17, 1992.]

MARK W. KNIGHT, Plaintiff and Appellant, v.
CITY OF CAPITOLA et al., Defendants and Respondents.

## COUNSEL

Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Dennis Kruszynski and Michael B. Moore for Plaintiff and Appellant.

Dwight L. Herr, County Counsel, Kathleen K. Akao, Assistant County Counsel, Atchison & Anderson and Vincent P. Hurley for Defendants and Respondents.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—While bodysurfing in the ocean at Capitola, Mark W. Knight was gravely injured when wave action abruptly hurled him against a hard sand bottom. He sued the City of Capitola, the County of Santa Cruz, and the State of California. The trial court granted all three defendants' motions for summary judgment. ■■■ Knight does not appeal from the judgment in favor of the state. We shall accept the parties' assumption that the court's orders constituted judgments finally disposing of Knight's actions against the city and the county.[1] Knight appeals from the judgment for the city; he also appeals from so much of the judgment for the county as awarded the county attorney fees, under Code of Civil Procedure sections 128.5 and 1038, on the ground that Knight's action against the county was maintained in bad faith and without reasonable cause. We shall affirm the judgments appealed from.

---

[1] The record contains orders granting the motions of the city and of the county for summary judgment, but not judgments on those orders. Strictly speaking a summary judgment is appealable (Code Civ. Proc., §§ 437c, subd. (*l*), 904.1, subd. (a)) but the preliminary order is not. (Cf. generally Cal. Civil Appellate Practice (Cont.Ed.Bar, 2d ed. 1985) § 2.14, p. 31.) In this case, however, both parties have treated the orders as judgments terminating Knight's lawsuit and it would not advance the interests of justice to insist upon the distinction. We shall therefore treat the orders as judgments and Knight's notice of appeal as directed to the judgments. (Cf. *Rose* v. *Fife* (1989) 207 Cal.App.3d 760, 764, fn. 3 [255 Cal.Rptr. 440]; *Dover* v. *Sadowinski* (1983) 147 Cal.App.3d 113, 115 [194 Cal.Rptr. 866].)

There is virtually no dispute as to the empirical facts reflected in the parties' moving and responding papers.[2]

The accident occurred in August 1987 at a beach, adjacent to Capitola, that faces south across Monterey Bay. Knight, a visitor to the area, had bodysurfed at other beaches. The technique involves riding incoming waves without a surfboard, by extending the body horizontally, with the head forward, and permitting the wave to carry the bodysurfer toward the beach. Normally the ride ends when the force of the wave subsides; the bodysurfer will then wade and swim out to catch another wave.

On the day of the accident the beach was experiencing shorebreaking waves, which are waves that break onto, or very near, the beach sand rather than at a greater distance from shore. A common cause of shorebreaking waves is an unusually steep offshore slope in the ocean bottom near the beach: The mechanics of wave action cause waves to break at such a slope, and as the breaking waves fall on the shore or in very shallow water they exert considerable hydraulic force against the underlying sand. Apparently Knight, while bodysurfing, was caught in a shorebreaking wave which hurled him headfirst against the hard sand bottom. The accident paralyzed him from the chest down.

There were lifeguards on duty at the beach; there is no showing that the lifeguards had warned Knight (or anyone else on that day) of dangers from shorebreaking waves. No signs were posted at the beach to warn of such dangers.

For recovery against the three public entities Knight relied on theories that the entities either had negligently created or, alternatively, had had notice of but had failed to take reasonable measures to protect against, a dangerous condition of public property. (Gov. Code, § 835.) In support of his theories Knight relied primarily on the fact that one or more of the entities had in essence rebuilt the beach in 1970. In or about 1965 Capitola's beach had been completely carried away by wave action. At that time representatives of the entities, and of the Army Corps of Engineers, devised a plan to give Capitola a permanent beach. The plan, executed in 1970, called for depositing a large quantity of imported sand at the beach site and for constructing a large rock "groin" jetty, protruding into the ocean at right angles to the beach

---

[2]Knight and the city each interposed numerous evidentiary objections to the other's showing, but the record before us reflects no ruling in the trial court on any of the objections. Because neither party appears to have insisted on a ruling we deem all such objections waived (*Howell* v. *State Farm Fire & Casualty Co.* (1990) 218 Cal.App.3d 1446, 1459-1460, fn. 9 [267 Cal.Rptr. 708]) and shall consider, as the trial court presumably did, "all of the evidence set forth in the papers" (Code Civ. Proc., § 437c, subd. (c)) filed by Knight and by the city.

line, at the east end of the reconstructed beach. The purpose of the groin was to alter the wave action in such a way as to establish an equilibrium between natural removal and natural replacement of the beach sand. Within a few months after completion of the project in 1970 an equilibrium was observed, and there was no further work on the groin, or on the overall configuration of the beach, after 1970. The beach's sand moved, under pressure from natural wave and current action, on a day-to-day and season-to-season basis, but the beach remained essentially intact after 1970.

A state engineer, who had been involved in the 1965-1970 project, testified at deposition that the effect of the project was to move the wave line away from the seawall: "We, in effect, moved the waves out. So . . . there was a change in the waves because the waves were breaking farther from shore than they were before we put the sand in." According to the engineer there was no other change in the wave action.

Knight submitted the declarations of two proposed expert witnesses. In support of the theory that the public entities had negligently *created* a dangerous condition, one of the experts declared that "[s]hore-breaking waves at Capitola Beach are caused by the configuration of the ocean floor as follows: there is a relatively flat slope above the water line but in the transition zone, there is a steep bank. [¶] The groin on the east end of the sandy beach causes this configuration of the ocean floor as follows: the groin traps sand behind it, which projects the shoreline out into the ocean and steepens the bank in the zone that connects the old beach floor to the new beach. [¶] The construction and existence of the groin has artificially changed the configuration of the ocean bottom at Capitola Beach." In support of Knight's alternative theory, that the city had taken insufficient measures to protect against injury from a known or knowable dangerous condition, the second expert expressed an opinion that the city should have provided "sufficient warnings of the dangerous shore-breaking condition . . . through proper signing and through lifeguards."

*Summary Judgment for the City.*

The city moved for summary judgment. ■ To prevail it was required to establish without material factual dispute either that a necessary element of Knight's case could not be proved or that the city had a complete defense. (*Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App.3d 628, 633-634 [164 Cal.Rptr. 621]. To negate an element of Knight's case the city asserted that it had no duty to prevent Knight's accident. ■ ■ ■ Alternatively, to establish a complete defense the city argued that it was entitled to public-entity immunity under either Government Code section

831.7 (which provides immunity to public entities and employees against claims arising out of hazardous recreational activities) or Government Code section 831.2 (which provides immunity against claims for injuries caused by a natural condition of any unimproved public property).[3]

The trial court granted summary judgment on all of the city's grounds. In a lengthy and detailed brief Knight argues that none of the grounds was established and therefore that summary judgment should have been denied. We shall conclude, contrary to Knight's position, that the city established without triable issue of material fact that it was entitled to natural-condition immunity under Government Code section 831.2.[4] Because section 831.2 provides a complete defense, summary judgment was properly entered; we need not assess Knight's challenges to the city's remaining grounds.

---

[3]The city did not plead its asserted immunities as affirmative defenses; it formally raised the immunities for the first time by its motion for summary judgment. Because Knight has contested the immunity issues on summary judgment, without procedural objection, we shall not deem the immunity defenses waived by the city's failure to plead them. (Cf. Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 3.76, pp. 300-301; cf. also 9 Grossman & Van Alstyne, Cal. Practice: Pleading—Civil Actions (2d ed. 1981) § 1557, p. 164.) Nor, in these circumstances, shall we insist upon the orthodox rule that a motion for summary judgment be limited to issues raised by the pleadings (cf. *Vanderbilt Growth Fund, Inc.* v. *Superior Court, supra,* 105 Cal.App.3d 628, 635): Patently, both parties understood that these immunity issues were implicit in the fact situation, and the issues were fully argued on their merits on essentially uncontradicted facts.

[4]The Supreme Court has suggested that, in general, the "logical sequence of inquiry" into a tort claim against a public entity will be to consider the abstract question of liability before turning to statutory immunities: "Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 201-202 [185 Cal.Rptr. 252, 649 P.2d 894]; cf. *Rombalski* v. *City of Laguna Beach* (1989) 213 Cal.App.3d 842, 856-859 [261 Cal.Rptr. 820] (conc. opn. of Crosby, Acting P. J.).) But where such a claim is founded on an assertedly dangerous condition of public property the proposed sequence tends to promote circular analysis. Public entity liability for such dangerous conditions is in the first instance defined and limited by statute (Van Alstyne, Cal. Government Tort Liability Practice, *supra,* § 3.3, pp. 180-181, as supplemented; cf. *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 809 [205 Cal.Rptr. 842, 685 P.2d 1193]; *McCauley* v. *City of San Diego* (1987) 190 Cal.App.3d 981, 991 [235 Cal.Rptr. 732]); the pertinent liability provision is Government Code section 835; section 835 provides for liability in specified circumstances "[e]xcept as provided by statute . . . ." (Italics added.) At least arguably, where an absolute statutory immunity (such as that provided by Gov. Code, § 831.2) would be applicable, a section 835 liability cannot arise in the first place. (Cf., e.g., *McCauley* v. *City of San Diego, supra,* 190 Cal.App.3d 981, 991-992.) In the circumstances of this case we deem it appropriate, notwithstanding the Supreme Court's admonition, to go directly to the question whether, for purposes of its summary judgment motion, the city adequately demonstrated it was entitled to a section 831.2 immunity. (Cf. also *Geffen* v. *County of Los Angeles* (1987) 197 Cal.App.3d 188, 192 [242 Cal.Rptr. 492].)

Government Code section 831.2 provides that "[n]either a public entity nor a public employee is liable for an injury caused by a natural condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach." Knight argues primarily that there were triable issues of fact material both to whether the public property was *unimproved* and to whether the condition was *natural,* and alternatively that under the rule of *Gonzales* v. *City of San Diego* (1982) 130 Cal.App.3d 882 [182 Cal.Rptr. 73] (as applicable at the time of the accident) the presence of lifeguards on the beach, and their failure to warn Knight of, or otherwise to take steps to protect him from, the shorebreaking waves, vitiated the section 831.2 immunity. We shall reject each of Knight's arguments.

## 1. *Condition of the Public Property.*

Knight finds authority for the proposition that the question whether the beach was unimproved is distinct from the question whether his accident was caused by a natural condition. (*Fuller* v. *State of California* (1975) 51 Cal.App.3d 926, 937 [125 Cal.Rptr. 586]; cf. *Bartlett* v. *State of California* (1988) 199 Cal.App.3d 392, 397 [245 Cal.Rptr. 32].)

While we respect the care with which Knight has undertaken to maintain this distinction, we suggest that in the circumstances of record the only inquiry relevant to application of Government Code section 831.2 is whether Knight's injuries were caused by a natural condition.

On its face the last clause of Government Code section 831.2 provides public entities with immunity, without express reference to the improved or unimproved status of the property, for injuries caused by "any natural condition of *any* lake, stream, bay, river or beach." (Italics added.) The meaning of this clause was placed directly in issue in *Osgood* v. *County of Shasta* (1975) 50 Cal.App.3d 586 [123 Cal.Rptr. 442] in which the plaintiff's decedent was killed in an accident on Shasta Lake, an artificially created lake. As a matter of semantics an artificial lake could not be regarded as "unimproved," but the Court of Appeal nevertheless affirmed dismissal of the action under section 831.2, pointing out that the last clause of section 831.2 had been amended in the legislative process to delete the word "natural" immediately before the word "lake" and to make the immunity unconditional. Thus "[t]he Legislature rejected a limited immunity inapplicable to artificial lakes in favor of an unconditional immunity applicable to all public lakes, including Shasta Lake." (50 Cal.App.3d at p. 590; cf. also *Eben* v. *State of California* (1982) 130 Cal.App.3d 416, 422-424 [181 Cal.Rptr. 714] [artificial reservoir behind dam]; *Keyes* v. *Santa Clara Valley*

*Water Dist.* (1982) 128 Cal.App.3d 882, 887-889 [180 Cal.Rptr. 586] [artificial reservoir]; see *Milligan* v. *City of Laguna Beach* (1983) 34 Cal.3d 829, 833-834 [196 Cal.Rptr. 38, 670 P.2d 1121].) Similar reasoning would essentially vitiate the "unimproved" requirement as applied to public streams, bays, rivers (see *County of Sacramento* v. *Superior Court* (1979) 89 Cal.App.3d 215, 218 [152 Cal.Rptr. 391] [dictum: artificial control of river flow]), and beaches. That the Capitola beach was artificially rebuilt, and sheltered by an artificially created rock groin, 17 years before Knight's accident would appear insufficient in and of itself to negate section 831.2 immunity.

It remains clear, however, that to invoke the statutory immunity the city would be required to show that Knight's injury was caused by a natural condition.

In *Osgood,* a pleading case, it had been alleged that the decedent's fatal injuries were caused by the configuration of the artificial lake's shoreline. The Court of Appeal had no difficulty with the natural-condition issue: "[I]t goes without saying that the shoreline of the lake is a natural condition thereof within the meaning of the section." (50 Cal.App.3d at p. 590.)

The question whether, in the circumstances of record before us, the interaction between the Capitola beach and the ocean waves was a "natural condition," in light of the reconstruction of the beach and addition of the rock groin, might be more difficult in the abstract. But "[i]t is now generally settled that human-altered conditions, especially those that have existed for some years, which merely duplicate models common to nature are still 'natural conditions' as a matter of law for the purposes of Government Code section 831.2. [Citations.]" (*Tessier* v. *City of Newport Beach* (1990) 219 Cal.App.3d 310, 314 [268 Cal.Rptr. 233]; cf. also *Morin* v. *County of Los Angeles* (1989) 215 Cal.App.3d 184, 188, 190 [263 Cal.Rptr. 479]; *Fuller* v. *State of California, supra,* 51 Cal.App.3d at p. 938.) In this light the opinion of Knight's expert, that "[t]he construction and existence of the groin has artificially changed the configuration of the ocean bottom," is, in the other uncontradicted circumstances of record, immaterial. It is uncontradicted that the imported sand deposited in 1970 was intended to replace a beach that had existed on the site but had been washed away, and that the rock groin was built to prevent the beach from washing away again. It is also uncontradicted that the new beach existed in a state of equilibrium, subject to sand movement in the natural force of the ocean currents, until Knight's accident 17 years later. In a strict sense the new beach, the groin constructed to keep it in place, and even the redirection of currents effected by the groin were, as Knight's expert suggests, artificial. But there is no showing whatsoever that the new beach differs in any material respect from the older beach as it had

existed before 1965. Nor is there any showing that shorebreaking waves, or abrupt sloping of the ocean floor at the edge of the beach which can contribute to the formation of shorebreaking waves, are unique to this beach or even to this coastal area: From the very expertise of the witnesses who have addressed the issue in this case it may be inferred that the condition occurs in nature and has been observed and documented elsewhere.

In sum it appears as a matter of law that at most a combination of human activities and natural forces created the condition which resulted in Knight's tragic injuries. Such a combination of forces, particularly where it produces, over a long period of time, a condition similar to those which occur in nature, has repeatedly been held to come within the immunity provided by section 831.2. (*Tessier* v. *City of Newport Beach, supra,* 219 Cal.App.3d at pp. 314-315; *Morin* v. *County of Los Angeles, supra,* 215 Cal.App.3d at p. 190; *Fuller* v. *State of California, supra,* 51 Cal.App.3d at p. 938.) The situation in *Buchanan* v. *City of Newport Beach* (1975) 50 Cal.App.3d 221 [123 Cal.Rptr. 338], on which Knight relies, represents an extreme case: The beach on which Buchanan was injured had been created, where none had existed before, by building a jetty and depositing the dredged sand in such a way as to raise the sand level 27 *feet* higher than it had previously been with a steep slope from the shoreline into the water. We join the several subsequent cases that have distinguished *Buchanan* on its unusual facts. (Cf., e.g., *Tessier* v. *City of Newport Beach, supra,* 219 Cal.App.3d at pp. 314-315; *Morin* v. *County of Los Angeles, supra,* 215 Cal.App.3d at p. 190; *Geffen* v. *County of Los Angeles, supra,* 197 Cal.App.3d at p. 195, fn. 4; *Mercer* v. *State of California* (1987) 197 Cal.App.3d 158, 165 [242 Cal.Rptr. 701]; *Eben* v. *State of California, supra,* 130 Cal.App.3d at p. 425.)

2. *Gonzales* v. *Superior Court.*

Alternatively Knight asks us to conclude, on the basis of *Gonzales* v. *City of San Diego, supra,* 130 Cal.App.3d 882 (but by adoption of the reasoning of the separate concurring opinion in *Gonzales* rather than of the majority opinion's "hybrid dangerous condition" (130 Cal.App.3d at p. 885) analysis) that "the provision of lifeguard services at Capitola Beach was a voluntary undertaking which induced reliance in the plaintiff to believe that he would be warned of any dangerous condition of the water, and that the city can be liable for breach of that voluntarily assumed duty by its failure to warn him of this known dangerous condition."

After the date of Knight's accident *Gonzales* was prospectively abrogated by the Legislature (Gov. Code, § 831.21), and the holding has been questioned or distinguished in a number of subsequent cases, including this

court's opinion in *City of Santa Cruz v. Superior Court* (1988) 198 Cal.App.3d 999, 1004-1006 [244 Cal.Rptr. 105]. Knight asks us to reconsider, for purposes of this accident to which the legislative abrogation would not apply, our conclusion in *City of Santa Cruz* that "the 'hybrid condition' rationale of *Gonzales* is completely inconsistent with the meaning and legislative intent" of section 831.2. (198 Cal.App.3d at p. 1007.)

In *City of Santa Cruz* we relied primarily not upon our criticism of *Gonzales*'s rationale but rather upon our perception that *Gonzales* was distinguishable, on the ground, among others, that in our case there was no evidence the victim relied on lifeguards to prevent him from making an unsafe dive or that he had assumed it was safe to dive because no lifeguard was present. ■ In this case it is undisputed that lifeguards were present and that they did nothing to warn Knight of the dangers posed by shore-breaking waves, but, as in *City of Santa Cruz,* there is no evidence that Knight in any sense relied on the lifeguards to warn him of the dangerous condition that caused his injury. As the justice who wrote the *Gonzales* opinion subsequently pointed out, "[t]he role of reliance within *Gonzales* is significant, for absent reliance the City's conduct would not have been an allegedly independent, contributing and concurring cause of the decedent's drowning." (*McCauley v. City of San Diego, supra,* 190 Cal.App.3d at p. 989.) We therefore find it unnecessary to expand upon our criticism of *Gonzales,* or to elaborate upon the criticisms leveled by other courts (cf., e.g., *Morin v. County of Los Angeles, supra,* 215 Cal.App.3d at pp. 190-193; *Rombalski v. City of Laguna Beach, supra,* 213 Cal.App.3d at pp. 856-863 (conc. opn. of Crosby, Acting P. J.); *Geffen v. County of Los Angeles, supra,* 197 Cal.App.3d at pp. 192-194): Whether or not good law, *Gonzales* does not support Knight's position in the circumstances of record here.

We conclude that in support of its motion for summary judgment the city demonstrated as a matter of law that it was entitled to immunity under Government Code section 831.2, and that Knight has not identified a triable issue of fact material to the city's showing. Summary judgment was properly granted. (Cf. *LaRosa v. Superior Court* (1981) 122 Cal.App.3d 741, 744-745 [176 Cal.Rptr. 224].)

3. *Attorney Fees for the County.*

The county also moved for summary judgment, on the ground that it neither owned nor controlled the accident site at the time of the accident, and at the same time moved for an award of defense costs, under Code of Civil Procedure section 1038, on the ground Knight and his attorneys had proceeded against the county in bad faith. Knight did not oppose the county's

summary judgment motion, which was granted. Over Knight's opposition the trial court also ordered Knight to pay specified defense costs, including attorney fees, to the county. Knight seeks review of the order for payment of attorney fees.

The trial court based its order on both sections 1038 and 128.5 of the Code of Civil Procedure. We are satisfied that the order was warranted under section 1038. Therefore, we need not reach Knight's contentions (1) that his conduct did not meet the standard of culpability set by section 128.5 and (2) that the trial court failed to include in its order a recitation of the conduct on which it based its order sufficient to comply with section 128.5, or our own concern (3) that because the county mentioned section 128.5 for the first time in its reply memorandum filed shortly before the hearing Knight may not have received the notice and opportunity to be heard contemplated by the statute.

■ Code of Civil Procedure section 1038 applies to (among other actions) civil proceedings under the California Tort Claims Act; in the Tort Claims Act context it "provides public entities with a protective remedy for defending against unmeritorious litigation" (*Curtis* v. *County of Los Angeles* (1985) 172 Cal.App.3d 1243, 1247 [218 Cal.Rptr. 772]) as a judicially approved alternative to a constitutionally proscribed action for malicious prosecution. (Cf. *City of Long Beach* v. *Bozek* (1982) 31 Cal.3d 527, 537-539 [218 Cal.Rptr. 772], judgment vacated and cause remanded (1983) 459 U.S. 1095 [741 L.Ed.2d 943, 103 S.Ct. 712], reiterated (1983) 33 Cal.3d 727 [190 Cal.Rptr. 918, 661 P.2d 1072] [Code Civ. Proc., § 1021.7]; *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 873-874 [254 Cal.Rptr. 336, 765 P.2d 498]; *Winick Corp.* v. *County Sanitation Dist. No. 2* (1986) 185 Cal.App.3d 1170, 1176-1177 [230 Cal.Rptr. 289]; *Curtis* v. *County of Los Angeles, supra*, 172 Cal.App.3d at p. 1247.) Section 1038 authorizes an award of defense costs, including attorney fees, where specified procedural requirements are met and the trial court determines that the plaintiff brought the action without "reasonable cause" or without "the good faith belief that there was a justifiable controversy under the facts and law which warranted the filing of the complaint . . . ." (Code Civ. Proc., § 1038, subds. (a), (b).) Section 1038 applies not only to initiation of an action but also to steps to pursue it after it has been filed. (Cf. *Curtis* v. *County of Los Angeles, supra*, 172 Cal.App.3d at p. 1252; *Ramsey* v. *City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1540 [270 Cal.Rptr. 198]; *Carroll* v. *State of California* (1990) 217 Cal.App.3d 134, 140 [265 Cal.Rptr. 753].) To avoid an order to pay defense costs under section 1038, a plaintiff must have filed and pursued the action in good faith *and* with reasonable cause. (Cf. *Carroll* v. *State of California, supra*, 217 Cal.App.3d at pp. 140, 141.) Thus a defendant who

can meet the procedural criteria of section 1038 need only show *either* that the plaintiff did not act in good faith *or* that the plaintiff lacked reasonable cause for the action.

The trial court's order recites that Knight's action "was initiated and maintained in bad faith and without reasonable cause . . . ."

■ *Good faith,* or its absence, involves a factual inquiry into the plaintiff's subjective state of mind (cf. *Carroll* v. *State of California, supra,* 217 Cal.App.3d 134, 141; *People* v. *Nunn* (1956) 46 Cal.2d 460, 468 [296 P.2d. 813]; cf. *People* v. *Lonergan* (1990) 219 Cal.App.3d 82, 90 [267 Cal.Rptr. 887]; *Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 282 [132 Cal.Rptr. 222]): Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it? A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence. Because the good faith issue is factual, the question on appeal will be whether the evidence of record was sufficient to sustain the trial court's finding.

*Reasonable cause* is to be determined objectively, as a matter of law, on the basis of the facts known to the plaintiff when he or she filed or maintained the action. Once what the plaintiff (or his or her attorney) knew has been determined, or found to be undisputed, it is for the court to decide " 'whether any reasonable attorney would have thought the claim tenable . . . .' " (*Carroll* v. *State of California, supra,* 217 Cal.App.3d at p. 141, quoting from *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 886.) Because the opinion of the hypothetical reasonable attorney is to be determined as a matter of law, reasonable cause is subject to de novo review on appeal.

Of the two requirements to avoid an order for defense costs, reasonable cause is obviously the more stringent. A normal enthusiasm for one's cause may in some circumstances provide the requisite subjective *good faith,* but the fact the plaintiff himself or herself (or his or her attorney) "thought the claim tenable" would be essentially irrelevant to objective *reasonable cause.* (*Carroll* v. *State of California, supra,* 217 Cal.App.3d at p. 142; cf. *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 877-882.) In this case the question whether the evidence was sufficient to sustain the trial court's inference of bad faith would be close but we need not reach it, because it is apparent to us that as a matter of law Knight lacked reasonable cause to file or maintain an action against the county.

■ Our reasonable cause inquiry focuses on ownership or control of the accident site. Knight argues in essence that a reasonable attorney might

have thought his claim tenable under either of the two alternative theories stated in Government Code section 835: That the county had neglected to warn of a known dangerous condition, or that the county had theretofore created the dangerous condition by participating in the 1965-1970 reconstruction. Both alternatives were subject to the rule that a public entity will not be liable for harm caused by a dangerous condition on public property (on *either* of the theories stated in section 835) *unless the entity owned or controlled the property at the time of the accident.* ■ "[I]n providing in Government Code section 835 that a public entity is liable for injury caused by a dangerous condition of 'its property,' the Legislature meant the public entity having ownership or control of the property at the time of the injury." (*Tolan* v. *State of California* ex rel. *Dept. of Transportation* (1979) 100 Cal.App.3d 980, 984 [161 Cal.Rptr. 307]; cf. *Longfellow* v. *County of San Luis Obispo* (1983) 144 Cal.App.3d 379, 382-383 [192 Cal.Rptr. 580]; Van Alstyne, Cal. Government Tort Liability Practice, *supra,* § 3.7, pp. 183-187, as supplemented.)

■ In this case there is no assertion that the county exercised any relevant *control* over the beach apart from what might be implicit in *ownership* of the beach. As to *ownership,* the record reflects that the Legislature had transferred the tidelands portion of the Capitola beach area from the state to the county in 1935 (Stats. 1935, ch. 687, pp. 1876-1878), but that the county, in turn, had conveyed its interest in the tidelands to the city in 1979, eight years before the accident, and had no relevant ownership interest after 1979. Thus, an indispensable factual element of Knight's claim against the county did not exist: The county neither owned nor controlled the beach at the time of the accident.

The easy case for lack of reasonable cause is one in which the plaintiff (and thus his or her attorney) can be shown to have been aware that an element of the cause of action was missing. No reasonable attorney, aware that the county neither owned nor controlled the beach at the time of the accident, would have considered Knight's claim against the county tenable.

■ Nor can a plaintiff meet the reasonable cause requirement simply by showing that he or she had no information, one way or the other, as to the existence of one or more elements of the cause of action. If a legislative purpose to protect public entities from meritless claims is to be served, a plaintiff must bear a burden of investigation sufficient to establish at least a basis for reasonable belief that all elements exist. Abstract hope is not reasonable belief: Under section 1038 a plaintiff who lacks even the basis for a reasonable belief in the existence of all essential elements of his or her claim cannot simply name every conceivable defendant and rely on what

future discovery may turn up. This point was clearly made, on facts comparable to those before us, in *Carroll* v. *State of California, supra,* 217 Cal.App.3d at pages 140-143.

*Carroll* involved a collision between private vehicles at a city intersection. The plaintiffs sued not only the city but also the county and the state, upon the theory that the intersection constituted a dangerous condition of public property. Both the county and the state denied ownership or control but the plaintiffs went ahead with their lawsuit including discovery. Ultimately, both county and state obtained summary judgments and Code of Civil Procedure section 1038 costs orders.

On appeal the plaintiffs argued they had proceeded in good faith and with reasonable cause. They "argue[d] that although the accident occurred in the City, the County or State may be liable for injuries created by a dangerous condition on property they control or on property made dangerous by a condition on adjacent property they own or control. [Citations.] Plaintiffs claim[ed] that the issue of joint control cannot be resolved without a factual inquiry [citation], and that joint control is not easily determined by merely examining public records. [¶] Plaintiffs argue[d] that they made an appropriate and good faith effort through the use of discovery procedures to determine if the County or the State exercised any hidden control at or near the intersection. Plaintiffs claim[ed] they proceeded with their discovery to determine this issue by [pursuing enumerated formal discovery procedures over a period of three and one-half months, beginning several months after the complaint was filed and served]." (217 Cal.App.3d at pp. 140-141.)

The Fourth District affirmed the Code of Civil Procedure section 1038 orders. The Court of Appeal reasoned that "[p]laintiffs' counsel fails to recognize that the determination of whether a party should be named in the original filing of a lawsuit is not predicated upon the attorney's belief that his client's interests are protected by naming every conceivable defendant, but whether the plaintiff has *initially* '. . . brought the proceeding with reasonable cause and in the good faith belief that there was a justiciable controversy under the facts and law which warranted the filing of the complaint . . . .' (§ 1038, subd. (a).)" After outlining the elements of section 1038 in light of *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d 863, the court continued: "[T]he probable cause element does not place an improper or unjustified hardship on these plaintiffs. The defendants have an ' "interest in freedom from *unjustifiable* and *unreasonable* litigation." [Citation.]' [Citation.] [¶] At the minimum, this term requires that the Plaintiffs' attorney have some articulable fact or facts to conclude that a particular person or entity should be *initially* included in the lawsuit as a party-defendant. Not only did Plaintiffs fail to present any basis to the trial courts of State or County 'control' in or near the intersection in dispute, but

a review of the discovery record indicates that Plaintiffs never raised the question of adjacent property 'owned or controlled' by the County or State during the course of this litigation. [¶] The record is replete with valid demands by both defendants at an early stage of the proceedings that they be dismissed as improper parties to the lawsuit. Those demands fell on deaf ears. The County had assured Plaintiffs' counsel before the complaint was filed that it had no control over the intersection. By the time Plaintiffs propounded their interrogatory responses to the County . . . , nine months had passed since Plaintiffs had been put on notice in the County's rejection of their claim that the County had no jurisdiction over the intersection. The State, through a declaration under penalty of perjury, informed Plaintiffs that it did not control or have any other relationship to the intersection. [¶] We find nothing in the record that even hints that Plaintiffs had any facts upon which to base a good faith belief or reasonable cause that either the County or the State 'owned, managed, operated, maintained, controlled, leased, and supervised the intersection . . . .' The only reference Plaintiffs made to any investigation came in argument before the [trial] court [after discovery]. Counsel for Plaintiffs stated that he had hired an outside expert to advise him concerning the status of the intersection. Even then, not one fact was presented to either court through affidavits or declarations of that expert as to what he had uncovered in his investigation of the County's or State's possible liability in this dispute. [Citation.] . . . [¶] Plaintiffs have failed to justify the initial filing of the complaint against these defendants and continued to maintain the lawsuit against the public entities with a certain arrogance. Plaintiffs have attempted to shift the burden from themselves to defendants to determine whether defendants had any possible liability." (217 Cal.App.3d at pp. 142-143, fn. omitted; cf. *Ramsey* v. *City of Lake Elsinore*, *supra*, 220 Cal.App.3d at p. 1540.)

Knight's only plausible basis for a belief the county owned the accident site would have been the 1935 statute that transferred the tidelands to the county. We find in the record no indication that Knight or his attorneys in fact relied on the 1935 statute, or that they were even aware of the statute before the state placed it in the record, in support of its own motion for summary judgment, in July 1990 (nearly two years after the action was filed). In his briefing in this court Knight does not directly assert that he or his attorneys were aware of the 1935 statute, but nevertheless appears to argue that for purposes of Code of Civil Procedure section 1038 he and his attorneys were entitled to infer, on the basis of the 1935 statute, that the tidelands still belonged to the county 52 years later, in 1987, and to pursue his action on the basis of that inference at least until such time as he and his attorneys could establish the true facts, to their own satisfaction, by formal discovery.

The inference of ownership would have been false, and the county's prompt denials of ownership would have sufficed to call its falsity to Knight's attention.

Knight filed his claim against the county in November 1987, reciting that the beach was "public property under the jurisdiction and control of the State of California, County of Santa Cruz, City of Capitola, *or one or more of them.*" (Italics added.) In December 1987 the county gave notice of denial of the claim, advising Knight among other things "that investigation demonstrates that the County of Santa Cruz does not own, contract or maintain the accident location. If a lawsuit is filed naming the County of Santa Cruz as a defendant, this [county counsel's] office will seek it[ ]s costs and attorney's fees pursuant to . . . Section 1038 in obtaining a dismissal."

Knight nevertheless named the county in his complaint, filed six months later in June 1988. There is no indication that in the interim Knight had examined the public records of Santa Cruz County, which contained a copy of the recorded 1979 deed transferring the tidelands portion of the beach area from the county to the city, or had taken any other step to investigate the county's denial.

The complaint apparently was not served on the county until March 1989, but again there is no indication in the record that Knight or his attorneys used the intervening nine months to investigate ownership, either by formal discovery from other defendants[5] or otherwise.

The deputy county counsel with principal responsibility for the county's defense placed two calls to counsel for Knight in April 1989. Counsel was unavailable and did not return either call.

In its answer, filed in April 1989, the county asserted several affirmative defenses, the first of which was that neither the county nor any of its agents "owned, operated, managed, designed, constructed, inspected, maintained, repaired or otherwise exercised control in any manner over the site of the alleged injury . . . at the time or times stated [in the complaint] . . . ."

Late in April 1989 the county director of parks (Angove) executed a declaration which stated that the beach "is not presently owned, maintained, operated or controlled by the County . . . as a recreational area and was not owned, maintained, operated or controlled by the County . . . as a recreational area on [the accident date alleged in Knight's complaint]. Nor does

---

[5]Knight did not follow the procedure, judicially recommended for the plaintiff caught between a shortage of articulable facts and tight California Tort Claim Act deadlines, of simply filing his lawsuit and then advising the county he would neither serve it on nor pursue it against the county unless and until discovery against legitimately designated defendants should disclose facts to justify those steps. (*Atchison, Topeka & Santa Fe Ry. Co.* v. *Stockton Port Dist.* (1983) 140 Cal.App.3d 111, 115-116 [189 Cal.Rptr. 208], distinguished in *Carroll* v. *State of California, supra*, 217 Cal.App.3d at pp. 142-143, fn. 3.)

the County have any agreements with the City of Capitola related to the maintenance, repair, or operation of Capitola Beach and did not have any such agreements on [the alleged accident date]." On the same day the county chief real property division agent (Loichinger) executed a declaration which stated that the county "has no present property interests in the Capitola Beach area and did not have any property interests in Capitola Beach on [the alleged accident date]." Early in May 1989 the deputy county counsel forwarded copies of both declarations to counsel for Knight with a letter which said, in pertinent part: "The County . . . is requesting its dismissal from this case based on the declarations submitted which indicate that the County does not own, maintain, control or is in any way responsible for Capitola Beach, the accident site referred to in your complaint. There is no statutory authority under the Government Tort Claims Act for imposition of liability against the County of Santa Cruz based on the facts alleged in the complaint. [¶] Capitola Beach is within the City limits of Capitola and is under the control and maintenance of the City of Capitola. The County has no authority to maintain the property known as Capitola Beach, therefore, absent a basis for imposing liability against the County, a dismissal is warranted. Should the County be forced to participate in discovery and bring a motion for summary judgment, it will request its attorney's fees and costs pursuant to Code of Civil Procedure § 1038. A continuation of this lawsuit against the County would constitute bad faith . . . ."

Counsel for Knight dismissed the Angove and Loichinger declarations as "the statement of bald conclusions without any information to demonstrate that what the declarant was saying was correct. [¶] In my professional opinion, I would have been acting in violation to my duties to my client if I dismissed the case against the County of Santa Cruz based on two declarations of county employees totalling only 4 lines of substantive text when that text merely stated conclus[i]ons without any evidence that the conclusions were correct." Late in May 1989 counsel for Knight wrote to the deputy county counsel: "Thank you for your letter of May 3, 1989. We are presently in the process of investigating your statements set forth in your letter and suggest you desist from filing any motion until we have had an opportunity to so investigate. [¶] Thank you for your courtesy and cooperation."

According to counsel for Knight he was "unable to unravel the ownership and work done on Capitola Beach without discovery." But apparently counsel did not pursue discovery against the county until October 1989, when Knight propounded his first set of interrogatories to the county. In November 1989 the deputy county counsel forwarded the county's answers to counsel for Knight, stating in a transmittal letter that "[a]s indicated in our responses, and as we have previously advised you, the County . . . does not own,

control, or maintain any property at the location of the accident site on Capitola beach. The beach is within the City of Capitola's jurisdiction. The County has no agreements related to maintenance or operation of the beach area, either now, or at the time of the accident. [¶] It is my understanding that you have conducted extensive discovery to date related to this case, yet you have not been able to advance any theory upon which the County could be held remotely liable. This lawsuit continues to be brought in bad faith based on the declarations previously submitted to you, and the lack of any theory of liability against the County. [¶] The County again reiterates its request to be dismissed as a named defendant. If the County is not dismissed by January 1, 1990, the County will proceed with its motion for summary judgment, and all costs incurred by the County up to the motions' date including participation and discovery will be requested pursuant to C.C.P. 1038." Counsel for Knight responded by letter at the end of November 1989, stating "please be advised that we are presently scheduling depositions that will be necessary before a final response to your letter is determined. We will attempt to schedule these depositions within the next 6 weeks."

On January 31, 1990, the Capitola city manager (Burrell) testified at deposition that the city had owned the beach at least since June 1979 and that the county had no involvement in the operations of Capitola Beach from 1982 to 1987. Burrell also testified (and Knight's attorneys apparently thus learned for the first time) that in about 1986 Santa Cruz County Sanitation District Number II had constructed a building to house a sewer pump station, and that the building also contained lifeguard facilities and restrooms available to recreational users of the beach. The building replaced an older restroom building; Burrell testified that the building was not on the beach.

Also on January 31, 1990, Knight's attorneys deposed Angove and Loichinger. In connection with the Loichinger deposition the deputy county counsel delivered copies of the deed and resolution by which the county had conveyed its interest in the adjacent tidelands to the city in 1979.

In his deposition Loichinger was somewhat equivocal as to the meaning of the 1979 deed and resolution. According to counsel for Knight, the deposition testimony of Loichinger and Angove "made it clear that they were unsure what the county's relationship with this beach area was." According to counsel for Knight, "[o]bviously, this kind of information was not definitive in this very serious quadr[i]plegia case. . . . [¶] I had noticed the depositions of representatives of the County of Santa Cruz under the code section that allows for representatives with the best knowledge on subjects listed in the deposition notice. The people that were produced, the same people that had sworn to the earlier conclusory declarations, really did not

have definitive knowledge that was necessary for me to determine that the County was not a proper defendant. [¶] In addition to the foregoing, Mr. Angove, at his deposition, indicated that the County might have done repair work on Capitola Beach after the 1982 storm. His repair work, of course, may have changed the configuration of the beach and thus the wave action."

According to the deputy county counsel, at the January 31, 1990, deposition session "I asked Plaintiff's counsel . . . if he would dismiss the County from this action based on the testimony of Mr. Burrell and Mr. Loichinger. [Counsel] stated he had some concern about the County's involvement in any dredging of Soquel Creek after the 1982 winter storms. I asked [counsel] if a declaration from our Director of Public Works stating the County had not participated in any dredging of Soquel Creek after the 1982 storms would satisfy his concerns. [Counsel] stated he would dismiss the County upon receipt of such a declaration. At no time at the depositions of Mr. Burrell and Mr. Loichinger did [counsel] state that ownership of Capitola Beach was still a matter in dispute."

In February 1990 the director of the county public works department (Fantham) executed a declaration which stated that the county "did not perform or participate in any maintenance repair work, or dredging of Soquel Creek after the 1982 winter storms, and the COUNTY did not perform or participate in any dredging maintenance, construction, or repair work to the Capitola beach or its adjacent sea wall after the 1982 winter storms." The deputy county counsel sent a copy of Fantham's declaration to counsel for Knight with a cover letter that described the declaration and said "[y]ou indicated this was a concern to you before dismissing the County of Santa Cruz from this lawsuit. [¶] Also enclosed is a request for dismissal. Please execute and return the same. If I do not hear from you within 30 days I will move . . . for summary judgment, and request attorneys fees and costs." The record does not reflect that counsel for Knight responded to this request; it is clear that Knight did not dismiss his action against the county.

Knight had noticed the deposition of state representatives most qualified to testify (cf. Code Civ. Proc., § 2025, subd. (d)) for January 31, 1990, but apparently the state did not produce its representative (a civil engineer named Muldavin) until late April. Muldavin had been involved in planning the 1970 work on the beach. Among other things at the April 1990 deposition, Muldavin was asked: "Q. As far as you're aware of was there any involvement by anyone from the County, that is the County of Santa Cruz, during the construction phase? [¶] A. Not to my knowledge." According to counsel for Knight, "Mr. Muldavin finally gave clear testimony concerning the various roles played by the City, State and County with respect to

Capitola Beach during various time periods. [¶] If county counsel had contacted me after the deposition of Mr. Muldavin, I would have recommended to my client that the County be dismissed as a defendant. The County did not do so but, instead, brought a motion for summary judgment and for award of defense costs without warning."

Contrary to this last assertion, it is difficult to imagine how the county could have given more warning. By this time trial had been set, apparently at Knight's request; the county, confronted by a statutory deadline (Code Civ. Proc., § 437c, subd. (a)), was obliged to file its motion for summary judgment (of which it had expressly warned Knight's attorneys at least three times) or lose the opportunity to do so and be obliged to go to trial.

If Knight had ever in fact relied on the 1935 statute, and if misplaced reliance on a 52-year-old statute would ever have been reasonable, we would conclude as a matter of law that it was no longer reasonable once the county denied ownership or control in December 1987, 6 months before the lawsuit was filed. Where a claimant relies for reasonable cause on facts which can be readily shown (by reference, for example, to the public record as in this case) not to exist, no more should be required of the public entity, for purposes of Code of Civil Procedure section 1038, than that it advise the claimant of the true facts and be prepared, on request, to provide reasonable verification of those facts. A fortiori this should be so where the claimant is aware of *no* facts to support a finding of reasonable cause. To require more of the public entity, in circumstances such as these, would be impermissibly to shift to the public entity the claimant's burden of establishing reasonable cause to file and to maintain the lawsuit. Knight argues that the December 1987 denial said no more than that the county had no ownership interest *at that time*, and left uncertain the ownership situation at the time of the accident four months earlier. The argument is unpersuasive: It is clear to us that no reasonable attorney, advised of the county's denial in the circumstances of record here, would have deemed Knight's case against the county tenable without further preliminary investigation.

By forcing the county into litigation and maintaining the lawsuit to the verge of trial, nearly two years later, Knight caused the county wholly unnecessary trouble and expense. Code of Civil Procedure section 1038 provides a mechanism by which the county may be compensated. The trial court made proper use of the mechanism; its order for defense costs must be upheld.

 The county suggests that in the circumstances we should find Knight's appeal to have been frivolous with respect to the county and should impose various sanctions. We are reluctant to do so. Such sanctions "should

be used most sparingly to deter only the most egregious conduct." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651 [183 Cal.Rptr. 508, 646 P.2d 179].) Although there is room to argue, on the basis of our analysis of the Code of Civil Procedure section 1038 issues, that "any reasonable attorney would agree that [Knight's appeal as to the county] is totally and completely without merit" (31 Cal.3d at p. 650), it would be difficult in all the circumstances to characterize the conduct of Knight and his attorneys as egregious. We shall exercise our discretion to deny sanctions on appeal.

The judgments for the City of Capitola and the County of Santa Cruz are affirmed. The county's application for sanctions on appeal is denied. The city and the county shall recover their ordinary costs on appeal.

Elia, Acting P. J., and Agliano, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied June 18, 1992. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the Court of Appeal, Sixth District, sitting under assignment by the Chairperson of the Judicial Council.