Filed 10/24/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HUMBOLDT COUNTY ADULT PROTECTIVE SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>THE SUPERIOR COURT OF HUMBOLDT COUNTY,<br><br>    Defendant and Respondent;<br><br>JUDITH C. MAGNEY,<br><br>    Real Party in Interest and Appellant. | A145981<br><br><br>(Humboldt County<br>Super. Ct. No. CV150159) |

## I. INTRODUCTION

The Health Care Decisions Law (Prob. Code, § 4600 et seq.)[1] recognizes and protects the "fundamental right" of adults to control decisions concerning their own health care, "including the decision to have life-sustaining treatment withheld or withdrawn." (§ 4650, subd. (a).)  Humboldt County Adult Protective Services (Humboldt) filed a petition under this law, ex parte and without notice, to effectively revoke Dick Magney's written advance care directive (the validity of which has never been questioned) by removing his wife as his designated agent for health care decisions and to compel medical treatment.  Humboldt took this action two weeks after Mr. Magney was hospitalized and while he was receiving palliative care, the course

---

[1]  All further statutory references are to the Probate Code unless otherwise indicated.

1

recommended by his treating physician (as well as by his prior treating physician and consulting cardiologist) and desired by both Mr. Magney and his wife.

Humboldt succeeded in procuring a temporary treatment order. It did so not only on the basis of an appallingly inadequate evidentiary showing, but also by misleading the trial court both as to pertinent provisions of the Health Care Decisions Law and as to Mr. Magney's medical status. Among other things, Humboldt deliberately made no mention of the physician actually treating Mr. Magney at the time, withholding from the court that physician's medical assessment of Mr. Magney's condition, and specifically, her opinion that palliative care was appropriate and consistent with his wishes. Within days of Mrs. Magney retaining counsel, Humboldt withdrew its petition and the trial court vacated the temporary treatment order.

The court denied, however, Mrs. Magney's request for statutory attorney fees. We reverse. On this record, Humboldt had no "reasonable cause" to proceed under the Health Care Decisions Law.

## II. BACKGROUND

### A. *The Health Care Decisions Law*

Three legislative findings undergird the Health Care Decisions Law: First, "that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn." (§ 4650, subd. (a).) Second, prolonging "the process of dying for a person for whom continued health care does not improve the prognosis for recovery may violate patient dignity and cause unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the person." (§ 4650, subd. (b).) Third, "in the absence of controversy, a court is normally not the proper forum in which to make health care decisions, including decisions regarding life-sustaining treatment." (§ 4650, subd. (c).)

Effective in 2000, the Health Care Decisions Law both recodified and modified then-existing statutes and added new provisions concerning the making of health care

2

choices by competent adults, including choices that remain operative when an adult subsequently lacks capacity to make such choices. (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 534 (*Wendland*); see generally 2000 Health Care Decisions Law and Revised Power of Attorney Law (Mar. 2000) 30 Cal. Law Revision Com. Rep. (2000) pp. 7–30.) The Law, located in division 4.7 of the Probate Code, "gives competent adults extremely broad power to direct all aspects of their health care in the event they become incompetent." (*Wendland*, *supra*, 26 Cal.4th at p. 534.)

Most significantly for purposes of this case, the Health Care Decisions Law provides the statutory framework for advance health care directives. An "advance health care directive" or "advance directive" is specifically defined to mean "either an individual health care instruction or a power of attorney for health care." (§ 4605.)

Part 2 of division 4.7, chapter 1 (entitled "Advance Health Care Directives") provides, in article 1, that an "adult having capacity" may do the following: "give an individual health care instruction" either orally or in writing (§ 4670), "execute a power of attorney for health care" (§ 4671), nominate a person to act as conservator of his or her person and/or estate for consideration by the court (§ 4672), and execute a written "advance health care directive" (§ 4673).[2]

Article 1 of chapter 1 additionally provides a number of procedural protections in the execution and recognition of advance directives. (§§ 4673 [requirements for legally sufficient directive]; 4674 [witness requirements]; 4675 [requirements where person is a patient in a skilled nursing facility].) In the absence of knowledge to the contrary, a health care provider "may presume" a written advance directive is valid. (§ 4676, subd. (b).)

---

[2] The Health Care Decisions Law elsewhere provides, in part 2, chapter 3, that a patient with capacity may also designate an adult as a "surrogate" to make health care decisions. (§ 4711 et seq.) Unlike the other options provided for in chapter 1, a surrogacy generally lasts only during the course of a particular treatment or illness, or during a stay in a health care institution. (§ 4711, subd. (b).)

3

Article 2 of chapter 1 sets forth the requirements for creating a power of attorney for health care.[3] (§ 4680 et seq.) Unless otherwise specified in the power of attorney, a power of attorney for health care becomes operative only when the principal lacks capacity, and ceases if and when the principal recovers capacity. (§ 4682.) The agent is to make health care decisions in accordance with "the principal's individual health care instructions, if any, and other wishes to the extent known to the agent." (§ 4684.) "Otherwise, the agent shall make the decision in accordance with the agent's determination of the principal's best interest," which includes considering the principal's "personal values to the extent known to the agent." (§ 4684.)

Chapter 2 of part 2, in turn, provides an exemplar form advance care directive. It is suggestive only (§ 4700) and includes both a "power of attorney for health care" and "instructions for health care." (§ 4701.)

The Health Care Decisions Law, thus, gives "effect to the decision of a competent person, in the form either of instructions for health care or the designation of an agent or surrogate for health care decisions." (*Wendland*, *supra*, 26 Cal.4th at p. 534.) "Such laws may accurately be described, as the Legislature has described them, as a means to respect personal autonomy by giving effect to competent decisions." (*Ibid.*)

The Law also "is intended to fulfill the incapacitated patient's desires and best interest without resort to judicial proceedings, except as a last resort." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 891 (1999–2000 Reg. Sess.) as amended Sept. 1, 1999 (Sen. Rules Com. Rep.), p. 9, quoting Cal. Law Revision Com.) Accordingly, an advance health care directive "is effective and exercisable free of judicial intervention" (§ 4750, subd. (a)), and an agent under a power of attorney for health care can make health care decisions "without judicial approval." (§ 4750, subd. (b).)

---

[3] These statutory provisions continued and recast the former law governing durable powers of attorney. (30 Cal. Law Revision Com. Rep., *supra*, p. 12.)

4

The Law, nevertheless, provides for the right to petition a superior court to: (a) determine whether or not a patient has "capacity to make health care decisions"; (b) determine whether an advance health care directive is "in effect or has terminated"; (c) determine whether the acts or proposed acts of an agent "are consistent with the patient's desires as expressed in an advance health care directive or otherwise made known to the court or, where the patient's desires are unknown or unclear, whether the acts or proposed acts of the agent . . . are in the patient's best interest"; (d) declare, if the patient lacks capacity, that the authority of the agent has terminated because the agent has authorized "anything illegal" or has "violated, has failed to perform, or is unfit to perform" the duty specified in the advance care directive to act "consistent with the patient's desires," or if the patient's desires are unknown or unclear, is "acting (by action or inaction) in a manner that is clearly contrary to the patient's best interest"; and (e) compel a third person to honor individual health care instructions or the authority of an agent. (§ 4766, subds. (a)–(e).) An advance care directive executed by an individual with legal counsel can preclude any right to petition, however, with two exceptions: if a conservator of the person seeks a determination under subdivisions (b) or (d) of section 4766, or an agent under a health care power of attorney seeks a determination under subdivisions (b) or (c) of section 4766. (§ 4753.)

The Law also enumerates who may file a petition: (a) the "patient"; (b) the "patient's spouse" (unless legally separated); (c) a "relative" of the patient; (d) the patient's "agent or surrogate"; (e) the "conservator of the person of the patient"; (f) the "court investigator" (under the Guardianship-Conservatorship Law, § 1400 et seq.); (g) the "public guardian of the county where the patient resides"; (h) the "supervising health care provider" or "health care institution" involved with the patient's care; or (i) "any other interested person or friend of the patient." (§ 4765.)

The Law requires that any petition must state facts showing the petition is authorized under the pertinent statutes, the grounds of the petition, and if known to the petitioner, the terms of any relevant advance health care directive. (§ 4767.) It

5

additionally allows for an award of attorney fees to (a) an agent or surrogate "if the court determines that the proceeding was commenced without any reasonable cause" or (b) to the petitioner "if the court determines that the agent or surrogate has clearly violated the duties under the advance health care directive." (§ 4771.)

With this overview of the Health Care Decisions Law, we turn to the particulars of the case before us.

## B. *Factual and Procedural History*

### 1. *The State of the Record*

We first must comment on the state of the record and Humboldt's lack of candor in its respondent's brief. The brief is replete with factual assertions based on unauthenticated medical records, many containing multiple levels of hearsay. Humboldt makes no mention of the fact these records were the subject of considerable debate and, ultimately, were not offered, let alone admitted, into evidence. Other factual assertions are based on a declaration that largely consists of bare assertions unsupported by any showing of personal knowledge. Humboldt makes no mention that this declaration also was, ultimately, not offered, let alone admitted, into evidence. (See *In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1271 [declarations are not automatically admitted into evidence].) Still other portions of the brief include factual assertions unsupported by any evidence, let alone competent and admitted evidence, including medical conclusions stated in such a way as to suggest they appear in the medical records, when, in fact, they do not.

Humboldt's brief thus transgresses fundamental appellate rules—that a party must support every factual assertion in a brief with a citation to the record (Cal. Rules of Court, rule 8.204(a)(1)(C)) and, absent a challenge to an evidentiary ruling excluding evidence, a party must make its case on appeal on the basis of the evidence duly admitted by the trial court (or at the very least, acknowledge the deficiencies of the purported evidence and disclose it was never admitted). (See *Connolly v. Trabue* (2012) 204 Cal.App.4th

6

1154, 1166, fn. 5.) We, therefore, disregard Humboldt's unsupported factual assertions and review this case based on the competent and admissible evidence in the record.

### 2. *Mr. Magney's Advance Health Care Directive*

Mr. Magney appointed his wife, Judith Magney, as his agent for health care decisions in an advance health care directive executed in 2011. He designated his sister as his alternate agent.

As permitted by the Health Care Decisions Law (§ 4682), the directive empowered Mrs. Magney to begin making health care decisions for her husband immediately, even while he remained competent and able to make them himself. The directive grants Mrs. Magney "full power to authorize, refuse or withdraw any medical treatment or to make any health care decision which is recommended or approved by a medical doctor, including but not limited to authorization for emergency care, hospitalization . . . and/or any other kind of treatment or procedure that, in my agent's sole discretion, my agent thinks necessary for my benefit and well being." It also asks all health care institutions and professionals to abide by "all decisions and instructions of my agent."

The directive defines the "health care decisions" for which Mrs. Magney has authority as including (1) the "consent, refusal of consent, or withdrawal of consent for any care, treatment, service, or procedure to affect my physical or mental condition . . . .;" (2) "the selection and discharge of health care providers and institutions, approval or disapproval of diagnostic tests, surgical procedures, and programs of medication;" and (3) "directions to provide, withhold, or withdraw artificial nutrition and hydration and all other forms of health care, including cardiopulmonary resuscitation." Mr. Magney averred, "I trust my agent [(my wife)], who knows and understands my desires, and in whose judgment I have absolute faith, to exercise discretion in a manner [she] thinks would be satisfactory to me."

"Before acting" as her husband's agent, the directive instructs Mrs. Magney to "attempt to communicate with me regarding my desires unless such attempt would be

7

futile.  If I am unreachable by such communication, and my desires regarding a particular health care decision are unknown, [she] should make the health care decision guided by . . . my personal values, any preferences that I have previously expressed, preferences stated herein, and information received from the attending physician(s)[,] concerning my prognosis, all the while having my best interests in mind.  In determining my best interests, my agent shall consider my personal values to the extent known to my agent."

The directive then lists Mr. Magney's instructions about his health care:  "If I have an incurable or irreversible physical or mental condition, even if I am not in a persistent vegetative state . . . I want care and treatment that will enable me to take part in activities of daily living, to eat and drink and to communicate meaningfully with others."  But, the instructions continue, "I want to live my life with dignity and for my loved ones to have pleasant memories of my final days.  Thus, I wish to be allowed to die without prolonging my death with medical treatment . . . that will not benefit me."

Finally, the directive, lists "personal values" Mr. Magney's wife is to consider in making decisions about his medical treatment:

"1.  I want to die a natural death without having my life prolonged by . . . nonbeneficial treatment.

"2.  I want my religious beliefs to be honored.

"3.  I want to die free of unnecessary pain and suffering even if pain medication will shorten my life.

"4.  I don't want to be a burden to my family.

"5.  I don't want my life prolonged, by any means, when this life has no more meaning for me."

After listing these values, Mr. Magney reiterated, "I trust my agent [(my wife)] to make my medical decisions within the context of these values."

Although not identical to the statutory advance health care directive exemplar form (§ 4701), the validity of Mr. Magney's advance directive has never been questioned.

8

### 3. *Mr. Magney's Hospitalization*

Mr. Magney was hospitalized in late February 2015[4] with multiple medical problems. Among other things, he had mitral valve endocarditis, a serious heart infection, which may cause nausea and reduce or eliminate appetite. Mr. Magney was unable to eat and severely malnourished, a condition consistent with the infection. He also had severe skin ulcerations on his backside.

About two weeks into Mr. Magney's hospital stay, on or about March 6, Dr. Stephanie Phan took over responsibility for his care and treatment. In reviewing his chart, including the progress reports of the previous treating physicians and subspecialists, Dr. Phan particularly noted a cardiologist's report that Mr. Magney had refused further workup of his heart condition. According to the cardiologist, Mr. Magney said he had refused surgery on his heart valve in 2012, deciding it was more than he could tolerate. He volunteered to the cardiologist that further interventions would be "silly," explaining he was a born-again Christian and ready for death. In light of these facts, the cardiologist had recommended withdrawing treatment apart from palliative or comfort care. The treating physician immediately before Dr. Phan entered a note in the chart that he agreed.

In addition to reviewing these reports, Dr. Phan reviewed all of Mr. Magney's lab and imaging studies. She also spoke with Mr. Magney and his wife, and examined Mr. Magney. Neither the labs, nor the examination, suggested any change or improvement during the two weeks of treatment Mr. Magney had received in the hospital.

The following day, Dr. Phan talked with Mr. Magney about his prognosis. She told him he had a number of serious medical conditions and was unlikely to " 'bounce back,' " even if all were treated in a " 'full-court-press.' " In fact, Dr. Phan thought further treatment would be futile. Even if, in " 'the very small likelihood' " he did

---

[4] Unless otherwise indicated, all date references are to 2015.

recover, she told Mr. Magney, he might not recover to the same baseline as before, might continue to develop complications from each medical condition, and might continue to experience pain. She thought he was likely to have a "really terrible quality of life."

Mr. Magney told Dr. Phan he was primarily concerned about help in managing his pain, and was not interested in continuing other treatment. He said he and his wife had been together for many years and shared a common religious faith, which helped him feel ready to accept the inevitable if his time had come. He said he did not want his life prolonged. Although he had a history of dementia and short-term memory problems, Dr. Phan concluded Mr. Magney was clear on this point, and she noted he continued to express this preference in their later discussions, never suggesting he wanted the hospital to resume other treatment. Dr. Phan further observed his wife was in accord and was his agent for health care decisions, and the two of them appeared to be in full agreement as to the desired course of care.

### 4. *Humboldt APS Launches an Investigation*

While Mr. Magney was hospitalized, Humboldt received a report that he might have been the victim of caretaker abuse or neglect, and it assigned public health nurse Heather Ringwald to investigate. Ringwald reviewed Mr. Magney's hospital records, and visited him in the hospital on March 10 or 11 (some four to five days after Dr. Phan assumed responsibility for his care) to take his statement. Ringwald found Mr. Magney to be confused, professing that he wanted to live and to die in the same breath.

Ringwald spoke to Dr. Phan, who advised her of the decision to provide only palliative care. Dr. Phan explained this had been the recommendation of the medical team, and Mr. Magney and his wife both agreed.

Ringwald, however, questioned Mr. Magney's capacity to make such a decision, observing he seemed confused, did not appear to understand the reason for his hospitalization, and was inconsistent in his statements about whether he wished to continue living. She also questioned Dr. Phan's right to discontinue medical treatment if Mr. Magney was stating he wanted to live. Although Mrs. Magney provided Ringwald a

10

copy of Mr. Magney's advance directive setting forth his instructions, Ringwald also questioned whether Mrs. Magney was acting in her husband's best interest or according to his wishes.

Ringwald then spoke with Dr. Ramil Francisco, whom she understood to be Mr. Magney's regular doctor assigned by the Department of Veterans Affairs (VA), and reviewed Mr. Magney's VA medical records. Although Ringwald knew Dr. Francisco had not seen Mr. Magney for about three months and was not treating him in the hospital, she asked him whether Mr. Magney's endocarditis and sepsis were reversible and also asked him to submit a letter regarding Mr. Magney's condition.

Two days later, on Friday, March 13, Ringwald and her supervisors decided to file a court action regarding Mr. Magney. Ringwald returned to the hospital, accompanied by a sheriff's deputy and a woman whom she understood to be a VA psychologist, Dr. Tanya Tom, to assess Mr. Magney's competency.

Ringwald made no attempt to contact Mr. Magney's sister, his alternative agent for health care decisions.

### 5. *Humboldt APS Petitions the Court to Order Treatment and Remove Mrs. Magney as Her Husband's Agent for Health Care Decisions*

Later that same day, March 13, Humboldt filed, ex parte and without notice, (1) a petition under section 4766 to remove Mrs. Magney as her husband's agent for health care decisions (removal petition), and (2) a request under section 4770 for a temporary order directing that antibiotics be administered to Mr. Magney to treat his endocarditis, sepsis and ulcers (treatment request[5]).

In its removal petition, Humboldt alleged Mrs. Magney had not timely sought medical help and had, thus, allowed Mr. Magney to develop skin ulcers, resulting in sepsis. Humboldt also alleged Mr. Magney's "conditions are treatable," he "is not competent," sometimes he states he "wants to be treated" while other times says he does

---

[5] Although Humboldt entitled its request for a temporary treatment order a "petition," we refer to it as a request to avoid confusion.

11

not, and Mrs. Magney "has directed the hospital to cease providing Mr. Magney with treatment for the ulcers, sepsis and endocarditis, which will likely result in his demise." Humboldt further alleged Mrs. Magney had "failed to perform or is unfit to perform the duty under the directive to act in the patient's best interests," and Mr. Magney lacked the capacity to revoke his advance directive "as specified in the declaration of Dr. Tanya L. Tom, PhD." The petition was verified by Ringwald, who averred its contents were true of her own knowledge except those matters stated on her information and belief.[6]

Neither Humboldt's petition nor its request for a temporary treatment order made any mention of Dr. Phan—the physician actually treating Mr. Magney and coordinating his hospital care. Thus, Humboldt did not apprise the court that Dr. Phan had reviewed Mr. Magney's medical records, spoken with the Magneys a number of times, and recommended only palliative care (as had the preceding treating physician and the consulting cardiologist). Humboldt, likewise, did not apprise the court that, in Dr. Phan's opinion, this was Mr. Magney's desired course of action and he had the capacity to make that choice.

Instead, Humboldt supported its petition and treatment request with a declaration by Ringwald and three other exhibits.

Ringwald's declaration contained a number of representations about Mr. Magney's condition, prognosis, and expressed wishes regarding treatment, and about Mrs. Magney's conduct leading up to and during his hospitalization. Many of these representations were made without any foundation indicating the source of her supposed knowledge, while others were offered on information and belief or were based on multiple levels of hearsay.[7] In responding to a subsequent motion to strike by

---

[6] The allegations of the petition provided no indication whether they were based on Ringwald's personal knowledge or her information and belief.

[7] For example, Ringwald made the following assertions in her declaration without disclosing the source of her knowledge: (1) Mr. Magney had been confined to his home bathroom for several weeks before he was hospitalized; (2) his wife brought him food and water during this period but did not seek medical assistance, and he developed severe

Mrs. Magney, Humboldt told the court it was not asking to have Ringwald's declaration admitted into evidence, but rather was offering it only to explain Ringwald's actions and not for a hearsay purpose (i.e., *not* for the truth of the matters asserted). Thus, ultimately, Ringwald's declaration was not offered, or admitted, into evidence.

The second of the attached exhibits[8] was a half-page letter on VA letterhead from Dr. Francisco. The letter stated Dr. Francisco was Mr. Magney's "assigned primary care physician," included one paragraph of abbreviated and cryptic medical notes regarding Mr. Magney's condition, and stated he would likely die if he did not receive treatment. The letter did not disclose that Dr. Francisco had not seen Mr. Magney for months and was not treating him in the hospital. Nor did Humboldt apprise the court that, while Dr. Francisco may have been Mr. Magney's assigned primary care physician within the VA health care system, he was not the "primary physician" for purposes of, and as defined by, the Health Care Decisions Law; rather, Dr. Phan was.[9] Dr. Francisco never

_____

ulcers on his backside; (3) it was "unclear" whether Mrs. Magney herself called an ambulance or a neighbor did; (4) Mr. Magney told someone his wife had gone out shopping and spending money while he was confined to the bathroom because she was overwhelmed by caring for him; (5) Mrs. Magney attempted to countermand her husband's request for medication in the hospital, storming out when an unidentified doctor gave him medicine; and (6) she told a social worker she could not take her husband home. Ringwald also stated on information and belief that Mrs. Magney told a social worker she called the ambulance because her husband fell.

[8] The first was a copy of Mr. Magney's advance directive.

[9] The Health Care Decisions Law defines " 'primary physician' " as "a physician designated by a patient or the patient's agent" to "have primary responsibility for the patient's health care, or in the absence of a designation or if the designated physician is not reasonably available or declines to act as primary physician, a physician who undertakes the responsibility." (§ 4631.) This Law also specifies that the "primary physician" is to determine "competency." (§ 4658.) Thus, a "primary physician" under the Health Care Decisions Law is not the same as a "primary care physician" within a healthcare system—a point Humboldt did not bother to mention or illuminate for the trial court. (Cal. Law Revision Com. com. 52B, West's Ann. Prob. Code (2009 ed.) foll. § 4631, p. 382 [in determining who is the primary physician under the Health Care Services Law an "institutional designation" as a "primary care physician" is "*not relevant*"], italics added.) To the contrary, Humboldt obfuscated this point in the trial

13

testified in this matter, and his letter, like Ringwald's declaration, ultimately, was not offered, or admitted, into evidence.

The third exhibit was a form competency declaration (approved for use in conservatorship cases) completed by the VA psychologist, Dr. Tanya Tom, who saw Mr. Magney for the first and only time on March 13. As we have noted, under the Health Care Decisions Law, the patient's "primary physician" determines competency (§ 4658), and, at the time, that was Dr. Phan. Nevertheless, Humboldt proffered Tom's declaration as establishing that Mr. Magney lacked capacity and therefore could not revoke his advance directive appointing his wife as his agent for health care, thus, compelling Humboldt to file a petition to remove her. Tom also did not testify in this matter, and her declaration also, ultimately, was not offered, or admitted, into evidence.

On the basis of Ringwald's patently deficient declaration, Dr. Francisco's misleading letter, and Tom's inapposite competency assessment—and not having been provided any information about Dr. Phan or her assessment and conclusions (or those of the preceding treating physician and the consulting cardiologist with whom Dr. Phan agreed)—the trial court granted Humboldt's ex parte request for an immediate treatment order the day it received it.

The Magneys first learned of Humboldt's activities the following Monday, March 16, when Humboldt personally served them with all the related court documents.

Mrs. Magney promptly retained counsel and, on Thursday, March 26, filed (1) a response to Humboldt's petition challenging Humboldt's standing, contesting the merits, and seeking dismissal and statutory attorney fees; (2) objections to and a motion to strike Humboldt's supposed evidence; and (3) declarations by Dr. Phan and Mrs. Magney.

Five days later, on Tuesday, March 31, Humboldt filed a notice it was withdrawing its petition, the only explanation being that its decision was "based, in part" on an attached document, which Humboldt described as a "medical progress report" from

---

court (and has continued to do so on appeal) by relying on Dr. Francisco's letter describing himself as the VA's "assigned primary care physician" for Mr. Magney.

14

a "Dr. Robert Soper, M.D." Neither the withdrawal notice, nor the supposed progress report, contained any information as to Dr. Soper's qualifications, field of expertise, or source or extent of knowledge about Mr. Magney. The report also was not authenticated, was not affirmed under penalty of perjury, and did not even appear to be final, as the signature line at the end of the document was blank, and followed a warning that the document was "*not considered FINAL until Signed by a Physician.*" Humboldt did not point the trial court to any particular part of Dr. Soper's report that it believed was significant in terms of dropping its petition under the Health Care Decisions Law. However, the supposed report made reference to a "conservatorship application" having been completed by Dr. Tom.[10]

On Thursday, April 2, at the scheduled hearing on its removal petition, Humboldt agreed the court could vacate its temporary treatment order, advising that the Humboldt County Public Guardian (Public Guardian) intended to file a petition for appointment as Mr. Magney's temporary conservator. The court vacated the treatment order and reserved jurisdiction to resolve outstanding issues, including Mrs. Magney's request for attorney fees.

A little over a week later, on April 10 and 13, the court heard evidence on Mrs. Magney's fee request to determine whether Humboldt had commenced this proceeding under the Health Care Decisions Law "without any reasonable cause." (§ 4771.) Ringwald and Dr. Phan testified, and the progress reports Dr. Phan prepared documenting her care of Mr. Magney were admitted into evidence at the request of Mrs. Magney.[11] In argument, Humboldt emphasized it had believed there was cause for

---

[10] Despite all the evidentiary shortcomings of this supposed progress report, Humboldt also cites to it in the "factual background" section of its respondent's brief as support for, among other things, the assertion a probate conservatorship was "appropriate" for Mr. Magney.

[11] Although Humboldt cross-examined Dr. Phan about other medical records prepared by other physicians, it did not attempt to authenticate those records or establish an exception to the hearsay rule allowing the court to consider statements contained in

15

concern about Mr. Magney and therefore it had acted appropriately in filing its petition and request for an order compelling medical treatment.

More than two months later, on July 22, the court issued an order denying Mrs. Magney's fee request, with the notation it could not find Humboldt had acted "without any reasonable cause." (Underscoring in original.) In a footnote, however, the court admonished Humboldt for withholding information in its petition and request for a temporary treatment order, observing it was "unknown" whether the treatment order (issued by a different judge) would have issued had the information been included. "Given the basic and fundamental rights involved," the court observed, it "would expect the information received from Dr. Phan, a hospital physician caring for Mr. Magney, to be provided to the Court when the temporary order was sought."[12]

them as independent proof of any fact. (See, e.g., *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 742–743 [hospital records must be authenticated to be admissible]; Evid. Code, § 1400 et seq. [authentication requirements]; *id.,* § 1270 et seq. [requirements for business records exception to the hearsay rule].) Humboldt neither offered these records, nor were they admitted, into evidence.

[12] In the meantime, on Friday, April 3, the day after Humboldt withdrew its petition and agreed the temporary treatment order could be vacated, the Public Guardian petitioned for appointment as Mr. Magney's conservator. What transpired in that proceeding is not relevant to the instant case commenced by Humboldt under the Health Care Decisions Law. We note, however, that upon interviewing Mr. Magney and his sister (Mr. Magney's alternative agent for health care), the court investigator recommended that an initially imposed temporary conservatorship be set aside and Mrs. Magney be reinstated as her husband's agent for health care, and the trial court promptly vacated its initial orders. The court also subsequently denied, after a full evidentiary hearing, the Public Guardian's conservatorship petition. Mrs. Magney's request for judicial notice of the conservatorship proceedings is therefore denied, except as to the points noted in this footnote. (Evid. Code, § 452.)

16

## III. DISCUSSION

### A. *Standard of Review[13]*

As discussed above, the Health Care Decisions Law, specifically section 4771, allows for a discretionary award of attorney fees to the agent under a power of attorney for health care "if the court determines that the proceeding was commenced without any reasonable cause." (§ 4771, subd. (a).) A reviewing court will interfere with a trial court's exercise of discretion only "where it finds that under all the evidence, viewed most favorably in support of the trial court's action, no judge could have reasonably reached the challenged result," or where the trial court "failed to follow proper procedure" or "applied the wrong legal standard." (*Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340 (*Scharles*).)

Our inquiry here, however, is somewhat more complex, since the predicate for any exercise of the discretion to award fees under section 4771 is a determination that the proceeding under the Health Care Decisions Law was "commenced without any reasonable cause." (§ 4771, subd. (a).) If a trial court's determination on this point is based on a misapprehension as to what "reasonable cause" means, then necessarily the court has not properly exercise its discretion. (*Scharles*, *supra*, 233 Cal.App.3d at p. 1340.) The meaning of "reasonable cause" under the Health Care Decisions Law is, of course, an issue of statutory construction, which we review de novo. (See *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 929; *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.) As we will also discuss, even when a trial court correctly understands what "reasonable cause" means in this context, its determination as to whether or not a petitioner proceeded with such is, likewise, subject to de novo review. (See *Hall v. Regents of University of California* (1996) 43 Cal.App.4th 1580, 1586 (*Hall*).)

### B. *"Reasonable Cause" Under the Health Care Decisions Law*

---

[13] Although Mr. Magney has since passed away, this appeal by Mrs. Magney is not moot.

The Health Care Decisions Law, itself, does not define the term "reasonable cause." (See §§ 4600 et seq. [definitions], 4771.) The courts have, however, considered the meaning of "reasonable cause" in numerous other contexts.

In *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851 (*Kobzoff*), for example, the Supreme Court analyzed a Government Claims Act fee statute, Code of Civil Procedure section 1038, which incorporates a "reasonable cause" requirement. That statute provides in relevant part: "In any civil proceeding under the Government Claims Act . . . the court, upon motion of the defendant . . . shall, at the time of the granting of [specified dispositive motions] . . . determine whether or not the plaintiff [or] petitioner . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justifiable controversy under the facts and law which warranted the filing of the complaint [or] petition . . . ." (Code Civ. Proc., § 1038, subd. (a).) If a court determines the proceeding was "not brought in good faith and with reasonable cause," a fee award is mandatory. (*Ibid.*)

The specific issue before the Supreme Court in *Kobzoff* was whether the statute embraces two requirements—both "good faith" and "reasonable cause"—that an unsuccessful plaintiff must meet to avoid a fee award to the defendant. (*Kobzoff*, *supra*, 19 Cal.4th at pp. 860–864.) The court held these are, indeed, separate requirements, and therefore a trial court need find only one unsatisfied in order to award fees. (*Id.* at pp. 863–864.)

With respect to the "reasonable cause" requirement, the Supreme Court observed the "terms 'reasonable cause' and 'probable cause' are generally considered synonymous, with 'reasonable cause' defined under an objective standard as ' "whether any reasonable attorney would have thought the claim tenable." ' " (*Kobzoff*, *supra*, 19 Cal.4th at p. 857.) " '*Reasonable cause* is to be determined objectively, as a matter of law, on the basis of the facts known to the plaintiff when he or she filed or maintained the action.' " (*Ibid.*, quoting *Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 (*Knight*), overruled on another point in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7;

18

see *Carroll v. State of California* (1990) 217 Cal.App.3d 134, 141–142 [case law developed in malicious prosecution context is "analogous, instructive and persuasive" in applying Code Civ. Proc., § 1038].)

Courts making "reasonable cause" determinations in other contexts have applied this same objective standard. (See, e.g., *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 926–927 (*Uzyel*) [interpreting "reasonable cause" under Prob. Code, § 17211, subd. (b), which provides for attorney fee awards in actions contesting a trustee's account]; *Salazar v. Upland Police Dept.* (2004) 116 Cal.App.4th 934, 949–950 [interpreting "reasonable cause" under Code Civ. Proc., § 1021.7, which provides for attorney fee awards in actions regarding peace officer performance or for libel or slander].)

We see no reason not to interpret "reasonable cause" as used in section 4771 in the same way—as setting forth an objective, reasonable person standard. Indeed, given the essential purpose of the Health Care Decisions Law—to protect an adult's "fundamental right" to make personal health care decisions, including the decision to refuse further medical treatment—mere subjective belief that a written advance health care directive should be overturned is not a sufficient basis to intrude into this private and sensitive domain. (Cf. *Sheldon Appel Co. v. Albert & Olikre* (1989) 47 Cal.3d 863, 882 (*Sheldon Appel*) [objective probable cause standard recognizes a defendant has an " 'interest in freedom from *unjustifiable* and *unreasonable* litigation' "].)

Whether the trial court here applied an objective standard in making its "reasonable cause" determination under section 4771 is unclear. The court ultimately appears to have credited Ringwald's testimony that she subjectively believed the situation was urgent based on hearsay statements in unauthenticated records prepared by physicians other than Dr. Phan.

In any case, Humboldt's insistence in the trial court and on appeal that it thought it was doing the right thing in invoking the Health Care Decisions Law and seeking judicial intervention misses the mark—its subjective belief is not relevant. (See *Sheldon Appel, supra,* 47 Cal.3d at p. 881.) Furthermore, as we have already alluded to above and will

19

discuss in more detail in the next section of this opinion, any professed good faith belief on its part is difficult to reconcile with the record it put before the trial court.

This brings us to the standard we are to apply in reviewing a trial court's "reasonable cause" determination under section 4771.  In the malicious prosecution context, and in other contexts, " '[b]ecause the opinion of the hypothetical reasonable attorney is to be determined as a matter of law, reasonable cause is subject to de novo review on appeal.' " (*Hall, supra,* 43 Cal.App.4th at p. 1586, quoting *Knight, supra,* 4 Cal.App.4th at p. 932; accord, *Kobzoff, supra*, 19 Cal.4th at p. 857 [applying same standard in reviewing reasonable cause determination under Code Civ. Proc., § 1038]; *Suarez v. City of Corona* (2014) 229 Cal.App.4th 325, 336 [same].)

Again, we see no reason to reach a different conclusion in examining a trial court's "reasonable cause" determination under section 4771.  As we have also observed, the more rigorous de novo standard of review well serves the purposes of the Health Care Decisions Law—to secure and protect an individual's fundamental right to make health care choices without unwarranted interference.

We, thus, turn to whether Humboldt had "reasonable cause" to commence this proceeding under the Health Care Decisions Law to overturn Mr. Magney's advance directive appointing Mrs. Magney as his agent for health care and to secure a temporary order compelling medical treatment.

## C. *Humboldt Lacked "Reasonable Cause" to File This Proceeding*

Reasonable cause exists "if the claim is legally sufficient and can be substantiated by competent evidence."  (*Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 449; see, e.g., *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 295 & fn. 22 (*Soukup*) ["*inadmissible*" diaries could not provide reasonable cause]; *Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 596 & fn. 9 [assertions based on "information and belief" will not establish reasonable cause].)

The trial court equivocated as to the need for any competent and admissible evidence, perhaps because it focused on Humboldt's claim Ringwald subjectively

20

believed there was some basis to take action under the Health Care Decisions Law. At the evidentiary hearing, for example, the court overruled Mrs. Magney's repeated evidentiary objections, expressing doubt that "the same rules of evidence" applied in evaluating "reasonable cause."

As discussed, however, the reasonable cause standard is an objective one, requiring review of the facts known to Humboldt when filing its petition. (*Kobzoff*, *supra*, 19 Cal.4th at p. 857.) And to be considered facts, assertions must be supported by evidence. (See, e.g., *Nick v. City of Lake Forest* (2014) 232 Cal.App.4th 871, 879.) Nothing in section 4771 or any other provision of the Health Care Decisions Law suggests the rules of evidence do not apply in this context. This silence indicates, moreover, those rules do apply. (Evid. Code, § 300 ["Except as otherwise provided by statute, this code applies in every action before . . . [a] superior court . . . ."].) It seems only appropriate, moreover, that the rules of evidence should apply, given that this Law is meant to *protect* valid advance directives and *shield* patients, like Mr. Magney, from unwarranted interference with their fundamental right to control their own health care.[14]

As we have recited, Humboldt's evidentiary showing in support of its removal petition and request for an order compelling immediate medical treatment was appallingly inadequate and established no facts supporting its invocation of the Health

---

[14] Citing *Ramsey v. City of Elsinore* (1990) 220 Cal.App.3d 1530, 1540, Humboldt maintains a petitioner need have only "some articulable facts" to sue under the Health Care Decisions Law. *Ramsey* was a dangerous condition of public property case wherein the court of appeal affirmed a defense summary judgment and a defense fee award under Code of Civil Procedure section 1038. *Ramsey's* attorney had been told the state, not the city, both owned and controlled the intersection in question. A statute also confirmed state ownership. (*Ramsey* at p. 1541.) Nevertheless, Ramsey sued the city. He made no factual showing in opposition to a defense motion for summary judgment, but relied "merely" on the "legal principle" that a public entity can be sued if it either owns or controls the public property in question—as the court ruled, this was manifestly insufficient to raise a triable issue. (*Id.* at pp. 1540–1542.) *Ramsey* certainly does not suggest Humboldt was free to posit facts unaccompanied by any competent evidentiary showing.

Care Decisions Law. Indeed, Humboldt rolled into court on a Friday, on an ex parte basis and without notice, with a petition and request for a temporary order compelling medical treatment that not only was based on glaringly incompetent and inadmissible evidence, but that Humboldt *knew* failed to apprise the trial court of critical evidence— namely, the clinical assessment and opinions of Mr. Magney's treating physician, as well as those of his prior treating physician and consulting cardiologist, all of whom concluded palliative care was called for.

Furthermore, Humboldt misrepresented the import of the supposed evidence it did present to the court. For example, Humboldt clearly implied Dr. Francisco was in charge of Mr. Magney's care *at that time*, pointing to Francisco's letter stating he was the "assigned primary care physician." In fact, Francisco had not seen Mr. Magney for some three months and Dr. Phan was Mr. Magney's treating physician—information of which Humboldt was well aware and which it deliberately omitted from its supposed evidentiary showing. And while Dr. Francisco may have been assigned by the VA as Mr. Magney's "primary care" physician within that health care system, he was not, as we have discussed, the "primary physician" for purposes of the Health Care Decisions Law. Dr. Phan was. (See fn. 9, *ante*.)

Similarly, Humboldt proffered VA psychologist Tanya Tom's form declaration to establish that Mr. Magney lacked capacity to revoke his advance directive (a requisite to the relief Humboldt was seeking under § 4766, subd. (d)). However, the Health Care Decisions Law specifies that the patient's "primary physician" is to determine capacity. (§ 4658.) As we have noted, moreover, the Law specifically defines "primary physician" as "a physician designated by a patient or the patient's agent" to "have primary responsibility for the patient's health care or, in the absence of a designation or if the designated physician is not reasonably available or declines to act as primary physician, a physician who undertakes the responsibility." (§ 4631.) Dr. Tom did not even arguably satisfy these statutory requirements. She is not a "physician." Nor was she designated by the Magneys. Rather, the one physician who had undertaken primary responsibility for

22

Mr. Magney's care at the time was Dr. Phan, whose very existence Humboldt knowingly concealed from the trial court.

Thus, while we hesitate to say Humboldt deliberately mislead the trial court and made what could be called a fraudulent evidentiary showing, that is the only conclusion we can reach on this record.

In the trial court, Ringwald attempted to defend Humboldt's lack of candor on the grounds the withheld information was "irrelevant" because she was focused on the alleged neglect that preceded Mr. Magney's hospitalization. There can be no excuse, however, in any context for knowingly misleading a judicial tribunal. Furthermore, Humboldt was invoking the *Health Care Decisions Law*, not statutory provisions concerning neglect and abuse, such as the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600). Success on its petition under the Health Care Decisions Law required evidence that (a) Mr. Magney lacked capacity to revoke his advance directive and (b) in agreeing to palliative care, Mrs. Magney was acting contrary to Mr. Magney's instructions in his advance directive. (§ 4766, subd. (d).) Dr. Phan's clinical assessment as to Mr. Magney's physical and mental condition, and her opinion as to the appropriate course of care, were highly relevant to both points. Thus, far from being irrelevant to Humboldt's action under the Health Care Decisions Law, the evidence Humboldt withheld from the court went directly to the two elements it was required to establish to overturn Mr. Magney's health care directive and remove Mrs. Magney as his agent for health care decisions, and to procure an order compelling medical treatment.

Ringwald eventually admitted she personally had "disagreed" with Dr. Phan's clinical assessment and medical opinion as to Mr. Magney's capacity, and she and her supervisors decided to "challenge" Dr. Phan's decision concerning his care. In the face of this admission, Humboldt's lack of candor as to both the pertinent legal standards set forth in the Health Care Decisions Law and Dr. Phan's clinical assessment and medical

23

opinions (or those of the prior treating physician or the consulting cardiologist) was beyond the pale.[15]

Humboldt clearly lost sight of the fact that the Health Care Decisions Law does not provide a forum to debate the wisdom of a particular individual's health care choices. When a competent adult has executed a valid advance directive, as Mr. Magney did, his or her instructions remain operative *after a loss of capacity*. Yet, after independently concluding Mr. Magney had lost capacity to make his own health care decisions, Humboldt nonetheless disregarded the provisions of his advance health care directive. Although his primary physician concluded further treatment would be futile, and his directive instructed that he be allowed to die a natural death in such circumstances, Humboldt sought a court order requiring him to undergo further medical treatment, ignoring the fact that, absent a showing his advance directive was invalid or had terminated, his instructions therein were controlling.

While it may have been Humboldt's view that further medical treatment was in Mr. Magney's "best interest," that was not consistent with *his* instructions or stated personal values—all of which he set forth when he indisputably had capacity to make health care choices and none of which Humboldt ever discussed or directed the trial

---

[15] At oral argument, Humboldt's attorney first attempted to minimize this omission, claiming, incorrectly, that Humboldt had, in its petition and supporting papers, told the trial court "a doctor" had approved "withholding the antibiotic therapy." In fact, however, it told the court Mrs. Magney made the decision. As we have recited, neither Humboldt's treatment request nor its removal petition so much as hinted at Dr. Phan's existence, or her medical conclusions. Humboldt's attorney also suggested that, had the removal petition and treatment request apprised the trial court of Dr. Phan's clinical assessment and medical opinions, Humboldt would not have succeeded in obtaining the order compelling treatment without providing further detail from the medical records that supposedly supported its position and, Humboldt's counsel queried, "When do we stop?" This explanation is every bit as troubling as Ringwald's; basically, counsel's view seems to be that if Humboldt needed to be duplicitous to get an order compelling treatment, so be it. That a statutorily recognized fundamental right was involved appears to have been of no moment to Humboldt or its attorney.

court's attention to in its removal petition or application for an order compelling treatment.

When asked at oral argument to identify which provisions of Mr. Magney's advance directive Mrs. Magney allegedly failed to heed, Humboldt's attorney asserted, referring to the never proffered and never admitted medical records, that, while hospitalized, Mr. Magney at one point requested continuation of antibiotics to treat his endocarditis and Mrs. Magney reportedly disagreed—the underlying premise apparently being that Mr. Magney was competent and his expressed desires therefore controlled. Humboldt's removal petition, however, was predicated on the claim that Mr. Magney lacked capacity. (§ 4766, subd. (d).) Indeed, that is why Humboldt presented the trial court with the (legally inapposite) form competency declaration completed by Dr. Tom. The assertion at oral argument, therefore, that Mr. Magney was competently requesting medical treatment is directly at odds with Humboldt's legal claim under the Health Care Decisions Law that the trial court was empowered to remove Mr. Magney's wife as his agent for health care decisions because he was incompetent and she was acting contrary to his advance directive. (§ 4766, subd. (d).)

Counsel's reliance on the unsubstantiated allegations of neglect prior to Mr. Magney's admission to the hospital, likewise, did not explain in what way Mrs. Magney, two weeks into Mr. Magney's hospitalization, failed to heed Mr. Magney's advance directive. As we have explained, those allegations are not relevant to Humboldt's claim under section 4766, subdivision (d), of the Health Care Decisions Law. Further, Humboldt never presented in this proceeding any competent and admissible evidence of the alleged neglect. In fact, Humboldt acknowledged in the trial court that Mr. Magney might have "remained in the bathroom [prior to his hospitalization] because he was stubborn." Humboldt never contended that prior to his hospitalization Mr. Magney lacked capacity to decide whether he wanted medical intervention, or that he asked his wife to arrange for medical treatment during this period and she refused.

25

Nevertheless, on appeal, Humboldt has repeatedly pointed to the medical records it presented to the trial court—records that indisputably lacked foundation and consisted of multiple levels of hearsay, and which were never offered, let alone admitted, for the truth of the matters asserted. Humboldt contends these evidentiary shortcomings are immaterial and this unauthenticated hearsay establishes sufficient reasonable cause under the Health Care Decisions Law to disregard an advance health care directive and procure an order compelling medical treatment. Humboldt relies on *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256 (*Silva*), a wrongful termination case.

In *Silva*, the court of appeal concluded witness interview forms and written statements were admissible to establish the employer conducted an appropriate investigation and made a reasonable personnel decision based on the information it obtained, applying the Supreme Court's holding in *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 (*Cotran*). (*Silva, supra,* 65 Cal.App.4th at pp. 264–265.) In other words, the interview forms were not admitted for the truth of the matters asserted therein. Rather, the focus was on whether the employer acted in *good faith*, honestly reaching a conclusion that a dischargeable act had been committed, " 'after an appropriate investigation and for reasons that are not arbitrary or pretextual.' " (*Cotran*, at p. 107, citing *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330, disapproved on other grounds in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 351 [the term " ' "good cause" ' 'connote[s] "a fair and honest cause or reason, regulated by good faith" ' "].) As we have discussed, that is *not* the standard applicable to determining whether a party has "reasonable cause" to commence a legal proceeding. (See, e.g., *Kobzoff, supra*, 19 Cal.4th at p. 857.) Furthermore, *Silva* observed that even in the wrongful termination context, " 'double and triple hearsay' " did not constitute substantial evidence supporting the reasonableness of a termination decision. (*Silva,* at p. 277.)

The unoffered, never-admitted medical records to which Humboldt points, well illustrate the wisdom of this evidentiary limitation. For example, Humboldt relies on two

pages of the records as providing "ample reason" that Mrs. Magney was acting contrary to her husband's desires. These pages contain notes that on a single date, a week before Dr. Phan assumed responsibility for his care, Mr. Magney said he felt better, did not want hospice care and preferred "only medical management without any surgery," and "his wife [did] not agree." The term "medical management" is not explained, and the subject of the alleged disagreement is unclear. Furthermore, what Humboldt knew and deliberately withheld from the trial court was that, subsequently, Dr. Phan reviewed all of Mr. Magney's hospital records and spoke with Mr. Magney about his condition and his desires, Mr. Magney said he wanted palliative care only, and she agreed with both the prior treating physician and the consulting cardiologist that palliative care was the appropriate course of care. The never-admitted medical records also indicate that Mr. Magney's sepsis problem may have resolved *before* Dr. Phan took over his care, but his hepatitis C had worsened and he had liver failure.

Humboldt also points to hearsay in these two pages that Mrs. Magney expressed concern about her ability to continue caring for her husband at home, and about whether Medicare would cover all of his medical costs. Even apart from the double hearsay problems, these notes do not suggest any basis for concluding Mrs. Magney was acting in a manner inconsistent with her husband's health care instructions in his advance directive. To the contrary, they appear to be entirely reasonable concerns and consistent with a desire to insure her husband received appropriate care. They certainly do not provide reasonable, let alone "ample," cause to effectively revoke Mr. Magney's advance directive by removing his wife as his agent for health care decisions.

In sum, Humboldt was not merely negligent in preparing its petition and request for an order compelling medical treatment under the Health Care Decisions Law; it knowingly and deliberately misrepresented both the law and the facts to the trial court. We would find such conduct troubling in any case. In the instant context we find it profoundly disturbing.

The Health Care Decisions Law protects the most personal of decisions and an adult's choice to die on his or her own terms. One of the most important features of an advance directive is that it *remains* operative if and when the patient loses capacity. (See *Wendland*, *supra*, 26 Cal.4th at p. 534.) We cannot subscribe to a scenario where a governmental agency acts to overturn the provisions of a valid advance directive by presenting the court with an incomplete discussion of the relevant law and a misleading compendium of incompetent and inadmissible evidence and, worse, by withholding critical evidence about the clinical assessments and opinions of the primary physician because that evidence does not accord with the agency's own agenda. No reasonable person, let alone a governmental agency, would have pursued such a course.

Having concluded, on this record, that Humboldt did not have reasonable cause to proceed, we need not decide whether Humboldt is a "person" authorized to file a petition and to seek a temporary order for medical treatment under the Health Care Decisions Law. We observe, however, that its authority to do so is questionable and that it abandoned this proceeding within days of Mrs. Magney pointing out it is not among the "persons" expressly authorized to file a petition. (§ 4765 [only governmental "persons" authorized to file petition under Health Care Decisions Law (set forth in div. 4.7 of the Prob. Code) are "court investigator, described in Section 1454, of the county where the patient resides" and "public guardian of the county where the patient resides," but petition may also be filed by "other interested person or friend of the patient" ]; compare § 1424 ["interested person" for purposes of div. 4 of the Prob. Code ("Guardianship, Conservatorship, and Other Protective Proceedings") expressly defined as including, but not limited to, "[a]ny interested state, local, or federal entity or agency" and "[a]ny interested public officer or employee of this state or of a local public entity of this state"]; see *People v. Vasquez* (2016) 247 Cal.App.4th 513, 519 [it is not the role of the courts to add language to a statutory provision the Legislature could have included, but did not].)[16]

_____

[16] That Humboldt is expressly authorized under the Elder Abuse and Dependent Adult Civil Protection Act to receive and investigate claims of elder abuse and to take

28

As we have discussed, lack of reasonable cause is a predicate determination to a discretionary award of fees under section 4771, subdivision (a). Accordingly, we ordinarily would remand the matter to the trial court to exercise its discretion as to whether to award fees. However, given the record in this case, in our view the court's discretion can only be exercised in one way—by granting Mrs. Magney's request for fees. We therefore reverse and remand for a determination and award of reasonable fees.[17]

## IV. DISPOSITION

The order denying attorney fees is reversed and the matter remanded to determine and award Mrs. Magney reasonable attorney fees. Mrs. Magney shall also recover costs on appeal.

---

"any actions considered necessary to protect the elder or dependent adult and correct the situation and ensure the individual's safety" (Welf. & Inst. Code, § 15600, subd. (i)) only highlights that the Legislature made no such provision under the Health Care Decisions Law, expressly authorizing only the Public Guardian or a court investigator to file a petition under this law. (See, e.g., *People v. Arriaga* (2014) 58 Cal.4th 950, 960["if a statute contains a provision regarding one subject, that provision's omission in the same or another statue regarding a related subject is evidence of a different legislative intent"].) When the Public Guardian became involved, moreover, it proceeded (unsuccessfully) under the conservatorship law, not the Health Care Decisions Law.

[17] In determining the amount of reasonable fees, the trial court is to take into account the attorney fees Mrs. Magney incurred in responding to Humboldt's removal petition and application for a temporary order requiring medical treatment, including those incurred in connection with the evidentiary hearing on her original fee application, those she has incurred on appeal, and those she incurs on remand in connection with determining the amount of reasonable fees to be awarded.

_____

Banke, J.


We concur:


_____

Margulies, Acting P. J.


_____

Dondero, J.


A145981


30

Trial Court:   Humboldt County Superior Court

Trial Judge:   Hon. Dale A. Reinholtsen

Counsel:

Jeffery S. Blanck, County Counsel, Blair Angus, Deputy County Counsel for Plaintiff and Respondent.

Harland Law Firm LLP, Allison G. Jackson for Real Party in Interest and Appellant.

No appearance for Respondent and Defendant.